UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  1/19/2021
```

------------------------------------------------------------------------X
                              :

TAYLOR GILBERT,                     :

               Plaintiff,      :

                              :          20-cv-3826 (LJL)

        -v-                   :

                              :     OPINION AND ORDER

INDEED, INC., et al.,          :

                              :

              Defendants.    :

                              :

------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants Indeed, Inc. ("Indeed"), Alexa Wachstein ("Wachstein"), Gabrielle Verbaro ("Verbaro"), and Michelle Lam ("Lam," and collectively, the "Indeed Defendants") move to compel arbitration and to stay the action or, in the alternative, to dismiss the claims against them. Defendant Aaron Schwartz ("Schwartz") moves to dismiss for lack of personal jurisdiction or, in the alternative, to compel arbitration.

For the following reasons, the motion to compel arbitration by the Indeed Defendants is granted and the motion to dismiss for lack of personal jurisdiction by Schwartz is granted.

## BACKGROUND

### I.    Plaintiff's Allegations

Plaintiff Taylor Gilbert ("Plaintiff" or "Gilbert") is a Senior Account Executive at Indeed where she has been employed since 2015. Dkt. No. 1 (the "Complaint" or "Compl.") ¶¶ 35, 40. Indeed is a foreign business corporation organized under the laws of the state of Delaware. *Id.* ¶ 24. Its principal business is to provide a search engine for job listings that connect prospective employees with employers. *Id.* ¶ 30. Defendant Schwartz, who no longer works at Indeed, was a manager based in Austin, Texas. *Id.* ¶¶ 3, 27. Defendant Wachstein was Plaintiff's supervisor.

*Id.* ¶¶ 6, 26.  Defendant Verbaro was a human resources manager at Indeed.  *Id.* ¶¶ 12, 28.

Defendant Lam was Plaintiff's manager until her employment at Indeed ended in March 2019.

*Id.* ¶¶ 10, 29.  The individual defendants other than Schwartz worked in the New York office of

Indeed.  *Id.* ¶¶ 26, 28-29.

The Complaint tells a brutal story in several parts.  The first part relates to the sexual

assault and rape of Plaintiff.  On July 13, 2015, Plaintiff, then 22 years old, began her

employment at Indeed as an Account Executive based in New York City.  *Id.* ¶¶ 34-35.  In late

July 2015, less than two weeks after she started her job with Indeed, Plaintiff attended a

multi-day orientation/training event in Stamford, Connecticut.  *Id.* ¶¶ 3, 44.  While she was at the

event, Schwartz—who was then a senior employee and an Indeed manager based in Austin,

Texas—sexually assaulted and raped her.  *Id.* ¶¶ 3-5, 45, 49-54.

The next day, Gilbert suffered through the rest of the day's training session.  She returned

to New York City following the orientation trip on July 24, 2015.  *Id.* ¶ 55.  On July 25, 2015,

she went to Mount Sinai Beth Israel Hospital and completed a rape kit.  *Id.* ¶ 56.  She also told

her parents and others about the rape but did not immediately tell her supervisors.  *Id.*

Her abuse did not end with the 2015 rape.  In the fall of 2015, a new male hire at Indeed

sent Gilbert a snapchat of himself in front of a mirror wearing only a towel.  *Id.* ¶ 66.  Gilbert

reported this incident to her then-supervisor, Wachstein, who disregarded it.  *Id.*  In December

2015, another Indeed employee "hit" on Gilbert over Indeed's intracompany chat system and

tried to solicit her to go to a bar with him.  *Id.* ¶ 68.  Also in December 2015, following a

company holiday party, another Indeed employee repeatedly commented on Gilbert's breasts and

tried to touch her even as she rebuffed his advances.  *Id.* ¶ 67.  That same employee, in February

2016, solicited Gilbert for oral sex.  *Id.* ¶ 69.

After suffering in silence for several months, Gilbert reported the rape to her then-supervisor, Wachstein, in March 2016 after seeing a person whom she believed to be Schwartz in the New York office. *Id.* ¶¶ 6, 59-60. She also told Wachstein how uncomfortable she felt when men at Indeed continuously "hit on" and sexually assaulted her. *Id.* ¶ 60. Wachstein acknowledged that Schwartz's conduct was criminal, that there was proof of rape, that Schwartz may have raped others, and that she (Wachstein) had a duty to report it, but stated that she would not do so. *Id.* ¶¶ 6, 61-62; Dkt. No. 43-1. Plaintiff also reported the rape to a more senior Indeed employee in the spring/summer of 2016, but Indeed took no action. Compl. ¶ 63.

Instead, Plaintiff's abuse continued. In July 2017, yet another male Indeed employee pressured Gilbert to have sex with him; she rejected his advances. *Id.* ¶ 70. In the fall of 2017, at an Indeed-sponsored happy hour, a male Indeed senior account executive told Gilbert she was his "type" and he would date her if he did not already have a girlfriend. *Id.* ¶ 71. In December 2018, the wife of an Indeed employee told Gilbert that a male Indeed employee at a party had groped her breasts. *Id.* ¶ 72. In October 2019, Schwartz—still an Indeed employee at the time—sent Gilbert a LinkedIn invitation. *Id.* ¶ 74. Schwartz then was sent to the New York office where Gilbert was working. *Id.*

The second part of Plaintiff's allegations relates to the medical conditions that Plaintiff developed in the aftermath of the rape and Indeed's reaction to those conditions. Plaintiff alleges that she has suffered from depression, post-traumatic stress disorder, and other physical and psychological illnesses as a result of the rape, Indeed's failure to take action against Schwartz and decision to promote him and allow him to return to work, and the ongoing sexual harassment and hostile work environment she experienced at Indeed. *Id.* ¶ 75. Those conditions included: (1) pervasive and severe migraines, *id.* ¶¶ 76, 78; (2) stroke-like symptoms for which she was

admitted to the hospital, *id.* ¶ 77; (3) hospitalization for difficile bacterium, *id.* ¶ 79; and (4) positive tests for lupus and antiphospholipid syndrome, *id.*  She did not experience any signs of those ailments prior to the rape.  *Id.* ¶ 83.  Gilbert alleges that she needed reasonable accommodations to address her medical conditions, that Defendants Lam and Verbaro and others were aware of the medical conditions, and that she was not only denied reasonable accommodations but was unlawfully discriminated against based on her medical conditions.  *Id.* ¶¶ 80-83.

In the third part of her Complaint, Plaintiff alleges a hostile work environment at Indeed through a pattern and practice of favoring through promotions and other beneficial treatment women who engage in sexual and/or romantic relationships with male colleagues.  *Id.* ¶¶ 85-87.  Plaintiff alleges Indeed discriminated against her for her failure to engage in such relationships, her objection to them, and her medical conditions.  *Id.* ¶¶ 88-98.  She identifies by pseudonym four specific women who were equally or less qualified than Plaintiff and identifies, sometimes by name, the male employees with whom they had sexual relations; she alleges that they were promoted and given favorable treatment because they, and not Plaintiff, were willing to have sex with male employees at Indeed and did not object to the hostile work environment at Indeed and did not have disabilities.  *Id.* ¶¶ 85-87, 91-92.

Finally, Plaintiff alleges that she was retaliated against, given negative reviews, and denied reasonable accommodations because of her complaints, her refusal to acquiesce to the culture at Indeed, and her medical conditions.  *Id.* ¶¶ 93-96; 99-107.

Plaintiff brings a series of claims against various groups of Defendants.  These include federal law claims against Indeed under: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), for gender discrimination, sexual harassment, hostile work

environment ("Count I"); the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), for discrimination based on disability and/or perceived disability ("Count II") and for failure to provide a reasonable accommodation ("Count VI"); and Title VII and the ADA for retaliation ("Count VII").

She brings state law claims against all Defendants under the New York City Human Rights Law ("NYCHRL") for gender harassment and disability/perceived disability discrimination ("Count III"), New York State Human Rights Law ("NYSHRL") for gender harassment and disability discrimination ("Count IV"), and the New York State Equal Pay Law, N.Y. Lab. L. § 194 ("Count VIII"). She further brings state law claims against Indeed, Verbaro, and Lam for failure to provide a reasonable accommodation in violation of the NYSHRL and NYCHRL ("Count VI").[1]

She also brings state law claims against Indeed, Wachstein, Verbaro and Lam under the NYSHRL and NYCHRL for retaliation ("Count VII")[2], and claims against Schwartz, Wachstein, Verbaro, and Lam under the NYSHRL and NYCHRL for aiding and abetting Indeed's gender harassment discrimination and retaliation ("Count V").

Finally, Plaintiff brings state law claims against Schwartz pursuant to N.Y. C.P.L.R. § 213-c for violation of N.Y. Penal Law § 130.25 ("Count IX") and to the Gender-Motivated Violence Act ("GMVA"), N.Y.C. Admin. Code § 8-901 *et seq.* ("Count X").

---

[1] In the Complaint, Count VI groups together claims based on the failure to provide a reasonable accommodation in violation of the ADA against Indeed only and in violation of the NYSHRL and NYCHRL against Indeed, Verbaro, and Lam.

[2] In the Complaint, Count VII groups together claims based on retaliation in violation of Title VII and the ADA against Indeed only and in violation of the NYSHRL and NYCHRL against Indeed, Wachstein, Verbaro, and Lam.

## II.      The Relevant Arbitration Provisions

Upon commencing her employment with Indeed, on July 12, 2015, Plaintiff signed a document entitled Nondisclosure, Inventions Assignment and Arbitration Agreement (the "Nondisclosure Agreement").  The Nondisclosure Agreement recites certain agreements Plaintiff makes in exchange for consideration, including her employment with Indeed.  Those agreements include that she is an at-will employee, that she will not compete with Indeed for a period of time after the end of her employment, provisions with respect to the assignment of any inventions she conceives during the course of her employment, and an arbitration agreement.  The arbitration clause states:

> The parties hereby agree to submit all disputes I might have against the Company, and all disputes the Company might have against me, to final, binding arbitration to the fullest extent permitted by law. This provision shall be referred to herein as the "ADR Agreement." The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, shall govern the interpretation and enforcement of this ADR Agreement. The statutory limitations period shall apply to any such claim asserted in any arbitration proceeding under this ADR Agreement. Arbitration is commenced for limitations purposes by submitting the matter to the arbitral forum.

Dkt. No. 31-1 § 8.

The arbitration provision lists the claims that are to be covered and not covered:

> (b) <u>Claims Covered</u>. The disputes covered by this ADR Agreement shall include any claims, including but not limited to claims known or accrued as of the date of execution of this Agreement, under applicable local, state or federal law that any current or former employee might have against the Company that arise out of and/or are ancillary to the employment relationship including, but not limited to, all claims related to . . . promotion . . . discipline; job placement . . . claims of unlawful harassment and/or discrimination including, but not limited to, claims based on . . . sex . . . disability . . . or any other protected class (including claims under Title VII of the Civil Rights Act of 1964 . . . the Americans with Disabilities Act . . . and any other local, state or federal law that deals with employment or employment discrimination . . . any other federal, state, or local law that deals with wages or hours . . . retaliation . . . violation of any federal, state, local or other governmental law, statute, regulation or ordinance that arises out of or is ancillary to the employment relationship. The disputes covered by this policy shall also include any claims an employee might have against any officer, director, employee or agent of the Company, or any of the Company's subsidiaries, divisions and affiliates, if that

claim in any way arises out of or is ancillary to the employment relationship. The disputes covered by this policy shall also include any claims under applicable local, state or federal law that the Company might have against the employee that arise out of or are ancillary to the employment relationship. Both the Company and the employee shall be precluded from bringing or raising in court or another forum any dispute that was or could have been submitted to binding arbitration.

(c) <u>Claims Not Covered</u>. Claims not covered by this ADR Agreement include those the employee might have for workers' compensation benefits, unemployment benefits, and claims arising under any of the Company's employee welfare benefit and pension plans (i.e., ERISA claims). Also not covered by this ADR Agreement are claims by either party for injunctive or equitable relief to the extent required to prevent irreparable harm, including but not limited to claims under Sections 2, 3, 4 and 7 of this Agreement.

*Id.* § 8(b)-(c).

The Nondisclosure Agreement requires a party who resists arbitration to pay the other side's costs, expenses and attorney's fees in connection with the motion to compel arbitration if the court nonetheless compels arbitration:

(d) <u>Failure to Comply</u>. With respect to any claim required to be submitted to arbitration under this ADR Agreement, should either the Company or the employee institute any legal action or administrative proceeding against the other by any method other than by arbitration and upon notice refuses to proceed in arbitration, then the responding party shall be entitled to recover from the initiating party all costs, expenses, and attorneys' fees incurred as a result of such action, including all costs, expenses, and attorneys' fees incurred in connection with a motion or petition to compel arbitration. If as a result of such a motion or petition, a court compels arbitration pursuant to this ADR Agreement, then the party seeking that order shall be entitled to its attorney's fees and costs incurred in pursuing that order or petition and it is agreed that the court issuing the order or petition shall have jurisdiction to award such fees and costs immediately following the issuance of that order or petition and before the commencement or completion of the arbitration, and without regard to whether the party that successfully compels arbitration ultimately prevails on the claims to be arbitrated.

*Id.* § 8(d).

Finally, the end of the Nondisclosure Agreement contains the following language in bold and all capitals:

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, AND I UNDERSTAND AND AGREE TO ITS TERMS. I HAVE ENTERED

> INTO THIS AGREEMENT VOLUNTARILY, AND HAVE NOT RELIED UPON ANY PROMISES OR REPRESENTATIONS OTHER THAN THOSE CONTAINED HEREIN. I ALSO ACKNOWLEDGE THAT I HAVE HAD THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY IF I SO CHOOSE REGARDING THIS AGREEMENT.
>
> I UNDERSTAND I AM GIVING UP MY RIGHT TO A JURY TRIAL BY ENTERING INTO THIS AGREEMENT.
>
> I UNDERSTAND I AM GIVING UP MY RIGHT TO COMMENCE OR PARTICIPATE IN A CLASS OR COLLECTIVE ACTION OR OTHER FORM OF REPRESENTATIVE ACTION AND INSTEAD AGREE TO ARBITRATE ANY EMPLOYMENT-RELATED DISPUTE ON AN INDIVIDUAL BASIS ONLY.

*Id.* at 5.

Also on July 12, 2015, Plaintiff signed the "Performance Unit Agreement" under Indeed's Long Term Incentive Plan Agreement ("2015 Performance Unit Agreement") that granted Gilbert performance units in the form of long-term cash award opportunities ("LTIP units"). Plaintiff signed a Performance Unit Agreement each year from 2015 to 2019. In exchange for LTIP units, Gilbert agreed to abide by and be bound by the terms of the Nondisclosure Agreement. For example, the 2015 Performance Unit Agreement states in bold:

> The grant of the 2015 Performance Units and payment of the 2015 Performance Units (whether vested or unvested) are subject to your execution and delivery to the Company of this Agreement, the execution and delivery to the Company of the NDA if you have not previously signed the NDA, and your continued compliance with the terms and conditions of the NDA. By your signature below, you hereby acknowledge that a copy of the Plan has been made available to you via the company's internal website and you hereby agree to abide by the terms of and conditions of this Agreement, the Plan and the NDA.

Dkt. No. 31-1.

The Performance Unit Agreement signed by Gilbert in 2019 (the "2019 Performance Unit Agreement") provides in nearly identical language:

> The grant of the 2019 Performance Units and payment of the 2019 Performance Units (whether vested or unvested) are subject to your execution and delivery to the Company of this Agreement, the execution and delivery to the Company of the

> Confidentiality, Proprietary Rights, Restrictive Covenants, and Arbitration Agreement ("Confidentiality Agreement") if you have not previously signed the Confidentiality Agreement, and your continued compliance with the terms and conditions of the Confidentiality Agreement.  By your signature below, you hereby acknowledge that a copy of the Plan has been made available to you via the company's internal website and you hereby agree to abide by the terms of and conditions of this Agreement, the Plan and the Confidentiality Agreement.

Dkt. No. 31-5.

On May 3, 2019, Gilbert signed an updated version of the Nondisclosure Agreement entitled the Confidentiality, Proprietary Rights, Restrictive Covenants, and Arbitration Agreement (the "Confidentiality Agreement").  The second paragraph of Section 11 of the Confidentiality Agreement provides:

> The parties hereby agree to submit all disputes Employee might have against the Company, and all disputes the Company might have against Employee to final, binding arbitration to the fullest extent permitted by law. This provision shall be referred to herein as the "ADR Agreement." The Federal Arbitration Act, 9 U.S.C. § 1 et seq., shall govern the interpretation and enforcement of this ADR Agreement. The statutory limitations period applicable to a claim asserted in a civil action shall apply to any such claim asserted in any arbitration proceeding under this ADR Agreement. Arbitration is commenced for limitations purposes by submitting the matter to the arbitral forum (i.e., JAMS or AAA as described in paragraph (e) below).

*Id.* § 11.

The "Claims Covered" is given the same broad definition and the "Claims Not Covered" the same narrow definition as in the Nondisclosure Agreement.  *Id.*  It also contains the same "Failure to Comply" provision, which is almost identical in substance, except for its cross-reference to paragraph 11(c) of the Confidentiality Agreement:

> (d) <u>Failure to Comply</u>. With respect to any claim required to be submitted to arbitration under this ADR Agreement, should either the Company or the employee institute any legal action or administrative proceeding (except those excluded under paragraph 11(c)) against the other by any method other than by arbitration, and upon notice refuse to proceed in arbitration, then the responding party shall be entitled to recover from the initiating party all costs, expenses, and attorneys' fees incurred in connection with a motion or petition to compel arbitration. If as a result of such a motion or petition, a court compels arbitration pursuant to this ADR

Agreement, then the party seeking that order shall be entitled to its attorney's fees and costs incurred in pursuing that order or petition, and it is agreed that the court issuing the order or petition shall have jurisdiction to award such fees and costs immediately following the issuance of that order or petition and before the commencement or completion of the arbitration, and without regard to whether the party that successfully compels arbitration ultimately prevails on the claims to be arbitrated.

*Id.* § 11(d).

The Confidentiality Agreement contains a choice of law provision providing for Texas law:

This Agreement and any issues regarding its enforceability or validity shall be governed by and construed in accordance with the laws of the State of Texas, without regard to the conflict of law principles thereof.  Employee acknowledges that, because Company's operations are based in Texas and Employee will have regular interaction with Company representatives based in Texas, it is appropriate and reasonable for a dispute concerning this Agreement to be determined in accordance with the laws of the State of Texas.

*Id.* § 18.

Finally, the Confidentiality Agreement contains a similar acknowledgement at the end and next to the employee's signature.

## III.    EEOC Complaint and Subsequent Indeed Agreements

On January 24, 2020, Plaintiff filed a charge of discrimination with the New York City Commission on Human Rights ("NYCCHR") and cross-filed the complaint with the Equal Employment Opportunity Commission ("EEOC").  Compl. ¶ 19.  The NYCCHR issued a notice of administrative closure on March 6, 2020, and the EEOC issued a Right to Sue Letter on May 5, 2020.  *Id.* ¶ 20.

On March 31, 2020, Indeed sent to Plaintiff the proposed Performance Unit Agreement under Indeed's Long-Term Incentive Plan Agreement (the "2020 Performance Unit Agreement"), which contained the same language as in the 2019 Performance Unit Agreement and required Plaintiff to reaffirm the Confidentiality Agreement.  Dkt. No. 43-2.  Indeed

requested an execution date of May 31, 2020.  Dkt. No. 43-4.  On April 22, 2020, Plaintiff sent

an email to Verbaro in which she rejected the 2020 Performance Unit Agreement:

> I reject the 2020 Performance Unit Agreement because I do not consent to any mandatory arbitration provision in the Confidentiality, Proprietary Rights, Restrictive Covenants, and Arbitration Agreement. As previously indicated by my counsel, I fully intend to pursue my rape/sexual harassment, discrimination, hostile work environment, failure to accommodate, unequal pay, retaliation and other claims and allegations raised in my New York City Commission of Human Rights Complaint in court. I am not willing to sign any new agreements that purport to inhibit this process. Additionally, my understanding is that the arbitration provision violates New York law.

Dkt. No. 43-3.

By letter from Plaintiff's counsel to Indeed, dated April 22, 2020, Plaintiff refused to

sign the agreement because of the mandatory proposed arbitration provision.  The letter recites in

part:

> We are aware that Indeed, Inc. ("Indeed") has recently offered a 2020 Performance Unit Agreement to Ms. Gilbert as part of Indeed's Long Term Incentive Plan ("LTIP"), and that the 2020 Performance Unit Agreement purports to require an acknowledgment to the Confidentiality, Proprietary Rights, Restrictive Covenants, and Arbitration Agreement. Ms. Gilbert has rejected the 2020 Performance Unit Agreement because she does not consent to any purported mandatory arbitration provision in the Confidentiality, Proprietary Rights, Restrictive Covenants, and Arbitration Agreement. As noted on many occasions and in previous correspondence with Indeed, Ms. Gilbert fully intends to pursue in court her rape/sexual harassment, discrimination, hostile work environment, failure to accommodate, unequal pay, retaliation and other claims and allegations raised in her New York City Commission on Human Rights Complaint and in prior demand letters. She will reject all new agreements that would purport to inhibit this process.

Dkt. No. 44-2.

After Plaintiff refused to sign the 2020 Performance Unit Agreement, Indeed did not

grant her LTIP units but continued to employ her.

**PROCEDURAL HISTORY**

Plaintiff initiated this action on May 18, 2020.  The Indeed Defendants waived service and were given until July 20, 2020 to respond to the Complaint.  Plaintiff and Schwartz stipulated that his response would be due by August 31, 2020.

On July 17, 2020, Plaintiff wrote a letter to the Court, stating that Indeed had demanded that Plaintiff dismiss her Complaint in favor of arbitration and that Indeed had threatened, if Plaintiff did not dismiss her Complaint, that it would file a motion to compel arbitration and seek to enforce the provision of the Confidentiality Agreement requiring Plaintiff to pay for costs and attorneys' fees in connection with that motion.  Dkt. No. 25.  Plaintiff requested permission for the parties to litigate the enforceability of the cost and fee issue at the outset.  On the same date, the Indeed Defendants filed a motion to compel arbitration, or in the alternative, stay the litigation.  Dkt. No. 29.

On July 21, 2020, the Indeed Defendants responded to Plaintiff's July 17 letter to argue that the Court should not make a preliminary ruling on the fees prior to ruling on the enforceability of the arbitration agreement.  Dkt. No. 34.  On the same date, the Court denied Plaintiff's letter motion and stated it would address the issue in connection with the motion to compel.  Dkt. No. 25.  Briefing by the Indeed Defendants concluded on September 18, 2020.

On August 31, 2020, Schwartz filed a motion to dismiss for lack of personal jurisdiction, or in the alternative, join the Indeed Defendants' motion to compel.  Dkt. No. 47.  Briefing by Schwartz concluded on October 13, 2020.

The Court held a hearing on the motions on October 19, 2020.  *See* Dkt. No. 65 ("Hr'g Tr.").  After the hearing, the Indeed Defendants filed a letter with the Court in which they withdrew the request in their motion to recover the costs and attorneys' fees incurred by them in connection with the motion to compel.  Dkt. No. 63.  On October 21, 2020, Plaintiff responded

in a letter to argue that this waiver was a tactical ploy to salvage the arbitration clause because enforcement of the provision would otherwise render the arbitration clause unenforceable.

## LEGAL STANDARDS

### I.       Motion to Compel Arbitration

"The Second Circuit has recognized that, depending on the facts and arguments presented, a motion to dismiss based on an arbitration clause may be treated as a motion to compel arbitration[.]" *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 405 n.1 (S.D.N.Y. 2016) (citing *Wabtec Corp. v. Faiveley Transp. Malmo AB*, 525 F.3d 135, 139-140 (2d Cir. 2008)).  The motion must either "explicitly or implicitly ask[ ] the court to order arbitration." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).  Where such a request is made and a movant thus manifests "an intent . . . to compel arbitration," the Court may "treat[ ] motions to dismiss based on mandatory arbitration clauses as motions to compel arbitration." *Id.* at 230 & n.3.

When deciding a motion to compel arbitration, courts apply a standard "similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (citation omitted).  On a motion for summary judgment, courts consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," and draw all reasonable inferences in favor of the non-moving party. *Id.* (citation omitted).  "Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id.* (citation omitted).  Courts must decide whether parties have agreed to arbitrate "unless the parties clearly and unmistakably provide otherwise." *Nicosia*, 834 F.3d at 229.

## II.        Motion to Dismiss under Fed. R. Civ. P. 12(b)(2)

"A court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims raised must first address the jurisdictional question" and must dismiss the action against any defendant over whom it lacks personal jurisdiction.  *Lugones v. Pete & Gerry's Organic, LLC*, 2020 WL 871521, at *2 (S.D.N.Y. Feb. 21, 2020) (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)); *see* Fed. R. Civ. P. 12(b)(2).

 "[T]he plaintiff bears the burden of showing that the court has jurisdiction over the defendant."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).  "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'"  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  If an evidentiary hearing is not held, plaintiff need make only a prima facie showing by its pleadings and affidavits that jurisdiction exists.  *Id.* at 85.  In contrast, when an evidentiary hearing is held, the plaintiff must demonstrate the court's personal jurisdiction over the defendant by a preponderance of the evidence.  *Id.*; *see also Metro. Life Ins. Co.*, 84 F.3d at 567.

This prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *Dorchester Fin. Sec.*, 722 F.2d at 85.  Although the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *id.*, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 659, 673 (2d Cir. 2013).

**DISCUSSION**

## I.   Indeed Defendants' Motion to Dismiss and/or Compel Arbitration

The Indeed Defendants move to dismiss on the basis that Plaintiff agreed to arbitrate the claims asserted in this action when she entered into the Nondisclosure Agreement, each of the Performance Unit Agreements between 2015 and 2019, and the Confidentiality Agreement. They also initially asserted that, under the same provisions, they are entitled to attorneys' fees and expenses in connection with their motion to compel arbitration.[3]  Plaintiff does not dispute that her claims would fall within the scope of the arbitration agreement if it were enforceable, but she argues that it is not enforceable.  She argues: (1) any prior agreements she made to arbitrate are not enforceable against her by virtue of her refusal to sign the 2020 Performance Unit Agreement; (2) New York State law makes it unlawful for an employer to require an employee such as Plaintiff to agree to arbitrate a statutory claim of discrimination; and (3) the arbitration agreement is otherwise unconscionable, including because it contains a provision requiring attorney-fee shifting when a court grants a motion to compel arbitration even when the employee has a meritorious discrimination claim but not when the court denies such a motion.  The Court takes these arguments in turn.

### A.   Agreement to Arbitrate

"This first step of the Court's inquiry is only a determination of whether there is an agreement 'to arbitrate any set of claims.'"  *Qazi v. Stage Stores, Inc.*, 2020 WL 1321538, at *3 (S.D. Tex. Mar. 17, 2020) (quoting *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 202 (5th Cir. 2016)).[4]  "Under Texas law, a valid contract requires an offer, acceptance, mutual assent,

---

[3] After oral argument in this case, Indeed agreed to forego its request for fees and expenses.  *See* Dkt. No. 63.  Nonetheless the issue is relevant to Plaintiff's argument that the fee-shifting clause renders the arbitration agreement as a whole unenforceable.

[4] The Confidentiality Agreement states that it is governed by and construed in accordance with

execution and delivery of the contract with the intent that it be mutual and binding, and consideration." *In re Online Travel Co.*, 953 F. Supp. 2d 713, 718 (N.D. Tex. 2013); *see also First Options of Chic. Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("[C]ourts generally . . . should apply ordinary state-law principles that that govern the formation of contracts.").

There is no real dispute that the parties agreed to arbitration when they signed the Nondisclosure Agreement, each of the Performance Unit Agreements, and the Confidentiality Agreement. *See Kalenga v. Irving Holdings, Inc.*, 2020 WL 7496208, at *7 (N.D. Tex. Dec. 20, 2020) ("Under Texas law, an employee's signature on a form acknowledging the agreement to arbitrate, method of acceptance, and receipt of the agreement by the signatory is an acceptance of the arbitration agreement as a matter of law.") (citing *In re Dall. Peterbilt, Ltd., L.L.P.*, 196 S.W.3d 161, 163 (Tex. 2006)).  Plaintiff's argument, instead, is that the arbitration clause in the Confidentiality Agreement does not have continuing effect, even as to past disputes, and that Indeed's decision to continue to employ her in the face of her rejection of the 2020 Performance Unit Agreement and her refusal to re-sign the Confidentiality Agreement forms a new contract that relieves her of the obligation to arbitrate.  In her view, that new contract, which does not require arbitration, supersedes the prior arbitration agreements.  *See* Dkt. No. 42 at 13.

Plaintiff's argument rests on the assertion that the obligations of the Confidentiality Agreement do not have continuing effect on their own terms and that those obligations need to be reaffirmed on an annual basis to be binding on her in future periods.  She points to Indeed's

---

the laws of the state of Texas.  Plaintiff disputes that this choice of law provision applies, but only because Plaintiff argues that the entire Confidentiality Agreement itself, as opposed to the choice of law provision specifically, has no force or effect.  Plaintiff agrees that, otherwise, the analysis is the same under Texas and New York law.  *See* Dkt. No. 32 at 8 nn.5-6.  The Indeed Defendants state that Texas law applies, but that the arbitration clause is binding under either Texas or New York law.  *See* Dkt. No. 42 at 12 n.5, 14 n.6.  The parties, and the Court, thus agree that as relevant here, Texas and New York law is identical in all material respects.

request every year that Plaintiff resign a Performance Unit Agreement to receive LTIP units and continued employment. *Id.* at 13-14. Plaintiff asserts: "This pattern of practice plainly demonstrates that the parties intended for a new arbitration proposal to be agreed upon each year, and that a rejection of the proposal in any subsequent year would cut off any previously agreed upon arbitration provision and any obligation by Indeed to provide Ms. Gilbert with additional LTIP units." *Id.* at 13.

The argument misreads the agreement and Texas law. The Confidentiality Agreement, signed by Plaintiff, addresses both "claims known or accrued as of the date of execution of th[e] [Confidentiality] Agreement" as well as those claims that accrue or arise during the term of the Confidentiality Agreement. Dkt. No. 31-5 ¶ 11(b). The Confidentiality Agreement further provides: "The parties hereby agree that, this Agreement shall not be modified, amended, superseded or terminated in whole or in part except in a writing signed by the parties. Any subsequent change or changes in Employee's duties, salary, or compensation will not affect the validity or scope of this Agreement." *Id.* ¶ 13. Plaintiff has not submitted such "a writing signed by the parties" that "modified, amended, superseded or terminated" the Confidentiality Agreement and its arbitration provision. *Id.* To the contrary, the Confidentiality Agreement continued to be in effect throughout the time the claims asserted in this action accrued and was reaffirmed by Plaintiff each year. Thus, the terms of that agreement and Plaintiff's obligation to arbitrate remain binding on her as to all of the claims asserted in this action. *See Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) ("The primary concern of a court construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. . . . The terms used in the [contract] are given their plain, ordinary meaning unless the [contract]

itself shows that the parties intended the terms to have a different, technical meaning.") (citations omitted).

Plaintiff could not unilaterally relieve herself of the obligations she has to arbitrate by refusing to sign the Confidentiality Agreement in connection with the 2020 Performance Unit Agreement.  In fact, the language of the 2020 Performance Unit Agreement cuts the other way. The 2020 Performance Unit Agreement addressed the grant and payment of the LTIP units.  It conditioned the grant and payment of those interests on three requirements: (1) the execution and delivery of the 2020 Performance Unit Agreement, (2) execution and delivery of the Confidentiality Agreement "if [Plaintiff] ha[d] not previously signed the Confidentiality Agreement," (3) and Plaintiff's continued compliance with the Confidentiality Agreement.  Dkt. No. 43-2.  Thus, the 2020 Performance Unit Agreement, like the similar agreements that preceded it, reflects the parties' understanding that if Plaintiff had previously signed the Confidentiality Agreement, its terms would remain in effect and there would be no need for Plaintiff to resign it.  Plaintiff's refusal to resign the Confidentiality Agreement in connection with the 2020 Performance Agreement thus is of no legal significance.  Plaintiff was bound to the terms of the Confidentiality Agreement by her prior signature on that agreement.  She was not required to resign the Confidentiality Agreement in 2020 and her refusal to do so thus cannot relieve her of her obligations under that prior agreement.

Plaintiff's refusal to sign the 2020 Performance Unit Agreement could be considered a repudiation by Plaintiff of the Confidentiality Agreement, i.e., a statement to Indeed of Plaintiff's intent no longer to abide by the terms of the Confidentiality Agreement.  But, even then, that refusal would not relieve Plaintiff of her obligation to arbitrate this dispute.  One party to an agreement cannot unilaterally relieve herself of her contractual obligations.  In the event of a

repudiation by Plaintiff, Indeed—as the non-breaching party—would have the option to rescind

the Confidentiality Agreement or enforce it and hold Plaintiff to her obligation to arbitrate.  The

contract would not cease to exist.  *See Gonzalez*, 394 F.3d at 394 ("When one party to an

agreement has repudiated it, the other party may then accept the agreement as being terminated

or consider the repudiation as a breach of contract and bring suit for damages.") (citation

omitted); *see also Mulvaney Mech. v. Sheet Metals Int'l Ass'n, Loc. 38*, 351 F.3d 43, 46 (2d Cir.

2003) ("Upon repudiation, a contract does not cease to exist, but merely becomes voidable, and

the non-repudiating party may enforce the contract or rescind it."); *see id.* ("The question

therefore is not the existence of an agreement, but rather the ongoing enforceability of an

agreement that the parties unquestionably had reached."); *Carpet et Cetera, Inc. v. Forde*, 2006

WL 2959063, at *3 (S.D.N.Y. Oct. 16, 2006) (finding that because "repudiation does not void

contract," the determination of whether "conduct amounted to a complete repudiation of the

Agreement such that [plaintiff] was excused from its obligations to arbitrate, is a question

properly answered by the arbitrators").

*Rightnour v. Tiffany & Co.*, 239 F. Supp. 3d 744, 752-53 (S.D.N.Y. 2017), upon which

Plaintiff relies, thus is inapposite.  *See* Dkt. No. 42 at 13-14.  The plaintiff in that case, unlike

Plaintiff here, had not previously signed, or been required to sign, an agreement with her

employer providing for arbitration.  The case raised the question whether the plaintiff had ever

agreed to arbitrate in the first place.  She claimed that she had not because, when her employer

sent her an email with a link to a dispute resolution agreement containing the arbitration

provision, she declined to click the link.  Her later action in logging into a set of "routine training

programs" online requiring her to acknowledge the terms of the dispute resolution agreement did

not, in the face of her earlier disavowal, constitute acceptance of an agreement to arbitrate

because she immediately clicked out of the program after reviewing the dispute resolution agreement and emailed her supervisor that she refused to complete the training because it would affect her claims in court.  The court held that plaintiff had not agreed to arbitrate and that her continued employment following her reading of the agreement did not reflect an intent to be bound by the agreement.  She had not signed a previous agreement to arbitrate and, upon reviewing the dispute resolution agreement and its arbitration clause for the first time, she immediately sent a letter to her employer rejecting the agreement.

Unlike in *Rightnour*, Plaintiff here previously signed agreements providing for arbitration, including the Nondisclosure Agreement in 2015 and its updated version, the Confidentiality Agreement, in 2019.  The Confidentiality Agreement provided for the continuing effect of the arbitration provision, and the Performance Unit Agreements did not change this effect but rather addressed the grant of LTIP units.

The result is the same under Texas law.  Plaintiff points to *Adcock v. Five Star Rentals/Sales, Inc.*, 2018 WL 1831646, at *3 (Tex. App. Apr. 18, 2018), in which a Texas appellate court held that an employer and employee had entered into a new agreement not to arbitrate based on the employer's silence in response to the employee's request for a copy of the arbitration agreement.  *See* Dkt. No. 42 at 14 n.6.  In that case, counsel for the employee emailed the employer, stating: "If my client does not receive a copy of the signed arbitration agreement in my office within one month of receiving this request, my client will proceed with filing suit in State Court and your failure to produce any signed arbitration agreement will be your acceptance to proceed in State Court and your waiver of enforcement of any arbitration agreement."  *Id.* at *2.  The employer was aware of the arbitration agreement when it received the letter, did not produce the arbitration agreement as requested, and after the employee brought suit, it continued

20

to litigate and respond to discovery requests rather than provide the agreement or otherwise challenge the letter.  Only six months later did the employer move to compel arbitration.  In effect, the employer acquiesced to the litigation.

There is no similar conduct on the part of Indeed here.  Indeed did not waive or forego its rights under the Confidentiality Agreement when Plaintiff rejected the 2020 Performance Unit Agreement, nor has it participated in the litigation without timely raising the issue of arbitration. It has early, repeatedly, and aggressively insisted on its rights to have this dispute resolved in an arbitral forum, making clear its view that Plaintiff was bound by the terms of that agreement and was required to arbitrate.  It thus cannot be deemed to have waived or acquiesced to litigation and is not estopped from relying on its contractual rights.

### B.   Enforceability Under New York Law of an Agreement to Arbitrate Statutory Discrimination Claims

Plaintiff argues that to the extent the arbitration clause is read to cover her statutory discrimination claims, it is null and void and cannot be enforced under Section 7515 of the C.P.L.R.  The Indeed Defendants argue that whether Section 7515 applies goes to the question of arbitrability.  In their view, the parties agreed to have the arbitrators decide whether the arbitration clause is null and void as applied to Plaintiff's discrimination claims.  If they decide that it is null and void, the case presumably would be returned to this Court.  Alternatively, the Indeed Defendants argue that if this Court reaches the issue, Section 7515 does not provide grounds for invalidating the arbitration clause because it is preempted by the Federal Arbitration Act ("FAA").

The Court rejects Plaintiff's first argument.  The "questions of arbitrability," which are reserved for the arbitrators under the provisions to which Plaintiff agreed, concern "certain gateway matters, such as 'whether the parties are bound by a given arbitration clause' or

'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 395 (2d Cir. 2018) (quoting *BG Grp. PLC v. Republic of Arg.*, 572 U.S. 25, 34 (2014)).  The effect of Section 7515 on the arbitration clause is categorically different.  It goes to whether the Indeed Defendants had the power in the first place to demand the arbitration with respect to the type of claims Plaintiff asserts here and whether that clause is of any legal effect whatsoever, regardless of whether Plaintiff's claims fall within the clause's scope.  This question thus is reserved for the Court to decide.  *See, e.g.*, *Gilbert v. Dell Techs., Inc.*, 415 F. Supp. 3d 389, 400 (S.D.N.Y. 2019) ("[C]ourts must decide whether Congress intended federal statutory claims asserted to be nonarbitrable.").

The Court accepts the Indeed Defendants' second argument.

Section 7515(b)(i) provides: "Except where inconsistent with federal law, no written contract, entered into on or after the effective date of this section shall contain a prohibited clause as defined in paragraph two of subdivision (a) of this section."  N.Y. C.P.L.R. § 7515(b)(i).  Paragraph two of subdivision (a) defines a prohibited clause as "any clause or provision in any contract which requires as a condition of the enforcement of the contract or obtaining remedies under the contract that the parties submit to mandatory arbitration to resolve any allegation or claim of discrimination, in violation of laws prohibiting discrimination, including but not limited to, article fifteen of the executive law [i.e., the NY State Human Rights Law]."  N.Y. C.P.L.R. § 7515(a)(2).[5]  Section 7515(b)(iii) goes on to provide that mandatory arbitration clauses that are prohibited clauses are "null and void."  N.Y. C.P.L.R. § 7515(b)(iii).

---

[5] Section 7515 was signed into law in April 2018 and became effective on July 11, 2018.  It initially applied to sexual harassment claims only, but was amended, effective October 11, 2019, to expand the prohibition on arbitration with respect to all forms of unlawful discrimination.

It states: "Except where inconsistent with federal law, the provisions of such prohibited clause as defined in paragraph two of subdivision (a) of this section shall be null and void. The inclusion of such clause in a written contract shall not serve to impair the enforceability of any other provision of such contract." *Id.*

Section 2 of the FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

The Supreme Court has held, in a ruling binding on this Court, that the saving clause "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

The Supreme Court has also held that "Section 2 'declare[s] a national policy favoring arbitration' of claims that parties contract to settle in that manner" which "foreclose[s] state legislative attempts to undercut the enforceability of arbitration agreements" so that "[t]he FAA's displacement of conflicting state law is 'now well-established,' and has been repeatedly reaffirmed." *Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (internal citations omitted); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) ("[S]tate law is preempted to the extent it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the FAA.'") (citation omitted).  Accordingly, it follows that "[w]hen state law prohibits outright the arbitration of a particular type of claim, … [t]he conflicting rule is displaced by the

FAA." *Concepcion*, 563 U.S. at 341; *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 122 (2001) (describing *Southland* as "holding that Congress intended the FAA to apply in state courts, and to pre-empt state antiarbitration laws to the contrary" and that "in *Allied-Bruce*, [] the Court declined to overrule it").

It follows from these principles that New York State cannot exempt Plaintiffs' federal employment discrimination and state law claims from mandatory arbitration under the FAA. Congress did not intend that discrimination claims be exempted from the FAA or its requirement that arbitration agreements requiring private dispute resolution be enforced "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991); *see also Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 203 (2d Cir. 1999) (Title VII). New York State lacks power to reach a contrary conclusion and to exclude such claims from the FAA when Congress has chosen not to do so. *See Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984).

The same conclusion also follows for Plaintiffs' state and city statutory claims. Claims under both federal and state and city discrimination laws generally can be the subject of mandatory arbitration. *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 120 (2d Cir. 2010). Moreover, the Supreme Court has held that the states possess no greater power to exempt from private arbitration and the scope of the FAA statutory claims that the states create than the states have to exempt from the FAA claims based on federal law. In *Southland*, the California Supreme Court, with the final word on issues of California state law, "interpreted the Franchise Investment Law to require judicial consideration of claims brought under that statute and concluded that the California statute did not contravene the federal Act." *Southland*, 465 U.S. at 5. The Supreme Court. with the final word on issues of federal law including

24

preemption, reached the contrary conclusion.  "The Federal Arbitration Act rests on the authority of Congress to enact substantive rules under the Commerce Clause" and "[i]n enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."  *Id.* at 10-1.  Thus, "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements."  *Id.* at 16.

With respect to the power of the states, the state statutory claims in *Southland* are materially indistinguishable from the state and city statutory claims here.  The Supreme Court has held that Congress has the power to compel arbitration in the employment context just as it has in the general commercial context.  *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 288-89 (2002); *see also Ragone*, 595 F.3d at 120; *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 147 (2d Cir. 2004).  The Court thus concludes, consistent with two other decisions in this District, that if Congress, in the FAA, withdrew from the states the power to adopt franchise laws and require the public resolution of claims based on those laws, it equally and necessarily withdrew from the states the power to adopt employment laws and to exempt from arbitration the resolution of disputes based on those laws.  *See White v. WeWork Cos., Inc.*, 2020 WL 3099969, at *5 (S.D.N.Y. June 11, 2020) (holding that Section 7515 was preempted by FAA); *Latif v. Morgan Stanley & Co. LLC*, 2019 WL 2610985 (S.D.N.Y. June 26, 2019) (same). [6]

The Court does not reach this conclusion lightly.  Justice Ginsburg has described Section 7515 as an example of one of those developments in which a state has "endeavored to safeguard

---

[6] *Tantaros v. Fox News Network, LLC* also involved claims under Section 7515 but the operative question there was whether to remand the case to state court for lack of subject matter jurisdiction based on "whether a claim arising under § 7515 necessarily raises a federal question within the original jurisdiction of this Court pursuant to 28 U.S.C. § 1331."  465 F. Supp. 3d 385, 389 (S.D.N.Y. 2020).

employees' opportunities to bring sexual harassment suits in court," *Lamps Plus*, 139 S. Ct. at

1422, and has written that such "developments are sanguine, for '[p]lainly, it would not comport

with the congressional objectives behind a statute seeking to enforce civil rights . . . to allow the

very forces that had practiced discrimination to contract away the right to enforce civil rights in

the courts,'" *id.* (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 750

(1981) (Burger, C.J., dissenting)).

As an original matter, there is little doubt that the 1925 Congress that passed the FAA

could never have imagined it being applied to preclude litigation of state or city statutory claims

that the state or city intended be litigated in a public forum. *Cf. Zarda v. Altitude Express, Inc.*,

883 F.3d 100, 142 (2d Cir. 2018) (Lynch, J., dissenting) (asking the question of whether

Congress intended a particular interpretation of a statute when the statute was originally

adopted), *aff'd sub nom. Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020). As Justices

Black, O'Connor, Thomas, and others have each persuasively demonstrated, the FAA was

adopted in 1925 pursuant to Congress' power to prescribe the jurisdiction and duties of the

federal courts and not pursuant to Congress's power to regulate in the area of interstate

commerce. *See Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U.S. 395, 418 (1967)

(Black, J., dissenting); *Southland*, 465 U.S. at 22 (O'Connor, J., dissenting) ("Congress thought

it was exercising its power to dictate either procedure or 'general federal law' in federal

courts."); *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 291 (1995) (Thomas, J.,

dissenting) (arguing that Section 2 of the FAA "was enacted as a purely procedural provision"

applicable only in federal court and was not intended to displace state law). It was passed in the

era of *Swift v. Tyson*, 41 U.S. 1 (1842), and prior to *Erie R.R. Co. v. Tomkins*, 304 U.S. 64

(1938), when it was understood that Congress could "prescribe general federal law applicable in

diversity cases." *Prima Paint*, 388 U.S. at 417.  "[T]he 1925 Congress viewed the FAA as a procedural statute, applicable only in federal courts, derived, Congress believed, largely from the federal power to control the jurisdiction of the federal courts."  *Southland*, 465 U.S. at 25 (O'Connor, J., dissenting).  Its primary purpose was procedural, to make an agreement to arbitrate enforceable in federal court the same as in state court.  *See Prima Paint*, 388 U.S. at 418; *Southland*, 465 U.S. at 16.  Indeed, it was not until 1984 that the Supreme Court held that the FAA was enforceable in state court.  *See Southland*, 465 U.S. at 16.  As Justice O'Connor, joined by Justice Rehnquist put it, after reviewing the relevant legislative history, it would have taken a "flight of fancy" to presume that the FAA was intended to be applicable in state courts. *Id.* at 28.

At the same time, both today and in 1925, it was generally understood that the Commerce Clause power did not extend to such items as purely intrastate gender-motivated violence.  Such matters fall within the police powers of the states.  *See United States v. Morrison*, 529 U.S. 598, 617 (2000) (holding that Congress could not use the Commerce Clause to enact 42 U.S.C. § 13981, which provided a federal civil remedy for victims of gender-motivated violence, because it would "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce").  It is anomalous to presume that Congress, which lacked the power to protect victims of domestic abuse with a federal remedy, has the power (and has exercised it) to deny the states the ability to provide victims of such abuse in the workplace a non-waivable right to a public forum.  It also appears anomalous that Congress would have the power, by statute, to exempt from the FAA claims based on statutes that Congress has created, *see, e.g.*, *Circuit City*, 532 U.S. at 119, 121, but that the states, which are considered generally to be "co-equal sovereigns" in our federal system, *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites*

*de Guinea*, 456 U.S. 694, 703 n.10 (1982) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)), lack entirely the ability to create statutory rights and require that those statutory rights be enforceable only in a public forum.[7]

But that all appears to be water under the bridge.  Congress has held that arbitration agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, and the Supreme Court has held that such language applies equally to state statutory as to state common law claims.

The contrary decision by the state supreme court in *Newton v. LVMH Moët Hennessy Louis Vuitton Inc.*, 2020 WL 3961988 (N.Y. Sup. Ct. July 10, 2020) is not persuasive.  That court understandably expressed that the New York legislature could not have intended that its statute would be preempted by the FAA in all cases where the discrimination claim arises from on-the-job discrimination: "[T]o suggest that the Legislature toiled to promulgate the general rule of CPLR 7515 only to have it immediately swallowed up by a 'federal law' exception, would be to suggest an 'objectionable, unreasonable or absurd consequence.'"  *Newton*, 2020 WL 3961988, at *5 (citation omitted).  The appropriate question, however, is what Congress intended with respect to the preemption of Section 7515, as Congress's intent has been inferred by the Supreme Court over the years.  Applying those cases, the Court concludes that Section 7515 is indistinguishable from the state statutes held preempted in *Southland*, *Concepcion*, and *Buckeye*, and thus that, regardless of the intent of the New York legislature, the Court cannot apply

---

[7] The Court notes that the FAA does not entirely give a private employer the right to opt out of public enforcement of a statute that the states pass in the exercise of their police powers.  If the EEOC or its state or city counterparts believe that the conduct in this or any other case transcends the interest of the individual victim, the FAA does not prevent them from investigating and then taking action, including action in a public forum.  *See Waffle House*, 534 U.S. at 286-87.

Section 7515 to relieve Plaintiff from the effect of her arbitration agreement even as to her state claims.

Plaintiff also argues that the FAA does not apply to her claims because they do not arise out of "a transaction involving commerce" under 9 U.S.C. § 2. She claims that the FAA is not applicable because the "[r]ape and its devastating aftermath clearly do not arise out of a 'transaction involving commerce'" and because the subsequent sexual harassment and retaliation claims that she faced occurred solely in New York. Dkt. No. 42 at 19. She again relies on *Newton* in which the court held that the FAA did not apply to the arbitration agreement because "[c]laims for sexual harassment claims, or other discrimination-based claims, cannot reasonably be characterized as claims concerning or 'arising out of 'a transaction involving commerce.'" *Newton*, 2020 WL 3961988, at *6. That court also held the FAA did not apply because the "acts of sexual harassment and related retaliation alleged in the complaint occurred intrastate—in defendant's New York City offices" and thus could not "possibly be cast as 'interstate' or 'economic in nature.'" *Id.* at *7.[8]

Plaintiff's argument can be quickly addressed; it asks the wrong question. Under the plain language of Section 2 of the FAA, the relevant question is not whether *the claim* arises from a transaction involving commerce, but rather whether *the contract* containing the arbitration clause "evidenc[es] a transaction involving commerce." 9 U.S.C. § 2; *see*

---

[8] *Newton* also distinguished the Supreme Court's decision to compel arbitration in *Waffle House* by stating that the "critical distinction" in *Waffle House* was that the dispute revolved "exclusively around a quintessential incident of 'employment,' i.e., the loss, by an employee, of his job and the salary and benefits that go with it, resulting in the employee's attempt, through EEOC, to pursue a judgment for backpay and reinstatement." *Newton*, 2020 WL 3961988, at *6. In contrast, the *Newton* court stated that the sexual harassment claims at issue "involve[d] alleged activity more akin to tortious conduct unrelated to the employer/employee contractual relationship." *Id.*

*Allied-Bruce*, 513 U.S. at 274-75 (holding "involving commerce" to be synonymous with "affecting commerce"). If it does, then the agreement to arbitrate "an existing controversy arising out of such a contract" is considered to be valid, irrevocable, and enforceable. *See Allied-Bruce*, 513 U.S. at 278.

The contract containing the arbitration clause here manifestly evidences a transaction involving or affecting commerce. In *Allied-Bruce*, the Supreme Court held that a termite protection contract between plaintiffs located in Alabama and the local Alabama office of a defendant, a multistate firm, "evidence[d] a transaction in commerce" because, in addition to the multistate nature of the defendant, the materials used in connection with efforts to carry out the contract came from outside Alabama. *Allied-Bruce*, 513 U.S. at 282. The Supreme Court later held that "it is perfectly clear that the FAA encompasses a wider range of transactions than those actually "'in commerce'—that is, 'within the flow of interstate commerce,'" *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (quoting *Allied-Bruce*, 513 U.S. at 273), and that "Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice . . . subject to federal control,'" *id.* at 57 (quoting *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)).

Here too, Plaintiff is located in New York and Indeed is a Delaware corporation with headquarters in Texas, offices in New York and Texas, and employment training in at least New York and Connecticut. The employment contract also "relates to a 'general practice' involving or affecting commerce," i.e., the employment of persons. *Simeon v. Domino's Pizza LLC*, 2019 WL 7882143, at *3 (E.D.N.Y. Feb. 6, 2019) (employment contract for pizza delivery drivers affected commerce); *see Waffle House*, 534 U.S. at 289 ("Employment contracts, except for

those covering workers engaged in transportation, are covered by the FAA." ); *Circuit City*, 532

U.S. at 119.[9]  Thus, the FAA applies to the arbitration clause in the Confidentiality Agreement.

### C.      Unconscionability

"[Q]uestions of contractual validity relating to the unconscionability of [an] arbitration

agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant

to the FAA." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir.

2003) (per curiam). "[G]enerally applicable contract defenses, such as fraud, duress, or

unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Assocs.*, 517

U.S. at 687.

Texas recognizes both substantive and procedural unconscionability. *See In re Olshan*

*Found. Repair Co., LLC*, 328 S.W.3d 883, 892 (Tex. 2010).[10]  "Substantive unconscionability

refers to the fairness of the arbitration provision itself, whereas procedural unconscionability

refers to the circumstances surrounding adoption of the arbitration provision." *Delfingen*

*US-Tex., L.P. v. Valenzuela*, 407 S.W.3d 791, 797 (Tex. App. 2013).  Texas courts generally

consider the following factors in determining whether a contract is unconscionable: "(1) the

'entire atmosphere' in which the agreement was made; (2) the alternatives, if any, available to

the parties at the time the contract was made; (3) the 'non-bargaining ability' of one party; (4)

whether the contract was illegal or against public policy; and (5) whether the contract is

---

[9] Although the Confidentiality Agreement warns that "[t]his is not an employment contract," the next sentence provides that "[e]mployee understands and acknowledges that his/her employment with the Company is for an unspecified duration and constitutes employment "at will" and may be terminated by Employee or the Company, at any time for any reason or for no reason, with or without notice."  Dkt. No. 31-5.  It also states that "Employee's employment/continued employment . . . is dependent upon Employee signing this agreement." *Id.*

[10] Although Plaintiff cites New York and Texas cases on unconscionability, she does not dispute that Texas law applies. *See* Dkt. No. 31-5 (2019 Confidentiality Agreement states that "any issues regarding its enforceability or validity shall be governed by and construed in accordance with the laws of the State of Texas.").

oppressive or unreasonable." *Carrillo v. ROICOM USA, LLC*, 2020 WL 5517200, at *7-8 (W.D. Tex. Sept. 14, 2020) (quoting *Delfingen*, 407 S.W.3d at 798). "Under Texas law and the FAA, the party opposing arbitration bears the burden of proof with respect to unconscionability since the law favors arbitration." *Sherr v. Dell, Inc.*, 2006 WL 2109436, at *3 (S.D.N.Y. July 27, 2006) (quoting *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001)).

### 1.    Substantive Unconscionability

Plaintiff argues that the arbitration clause, read to address the claims she makes in this case, is unconscionable because it violates public policy. Plaintiff also argues that, even if Indeed has now decided not to enforce it, the fee-shifting provision renders the arbitration clause unenforceable.

### a.    Public Policy

Plaintiff argues that the arbitration clause is substantively unconscionable because: (1) there is a New York and national public policy against mandatory arbitration of sexual harassment and discrimination claims and requiring private arbitration of rape and related sexual harassment claims would create a dangerous precedent by preventing other employees from knowing of the perpetrator; and (2) the arbitration clause was one-sided in favor of Indeed.

"Whether a contract is contrary to public policy or unconscionable at the time it is formed is a question of law." *In re Poly-Am., L.P.*, 262 S.W.3d 337, 349 (Tex. 2008). "An arbitration agreement covering statutory claims is valid so long as 'the arbitration agreement does not waive substantive rights and remedies of the statute and the arbitration procedures are fair so that the employee may effectively vindicate his statutory rights.'" *Id.* at 352 (quoting *In re Halliburton Co.*, 80 S.W.3d 566, 572 (Tex. 2002)). "[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer*, 500 U.S. at 26.

The policy concerns raised by Plaintiff and by those opposing mandatory arbitration of sexual harassment claims are legitimate and weighty.  There is a public cost to forcing those who have been victimized by sexual assault to raise those claims only in a private arbitral forum and denying them a public forum in which to air their grievances.  That cost can be measured both in the specific and in the general.  As Plaintiff notes, private arbitration might deprive those who are at risk from a sexual predator of the information necessary or helpful to protect themselves.  It also can have the effect of hiding from public view the extent of a problem of general societal concern.  *See, e.g.*, *Murphy v. Glencore Ltd.*, 2019 WL 549139, at *7 (D. Conn. Feb. 11, 2019) (noting the "gravity" of the same arguments made by plaintiff, which "have been the subject of passionate and contentious debate for decades across this nation's courts and legislatures").  However, even though the Court shares some of Plaintiff's concerns about arbitration in the employment context, it is bound by precedent.  "Congress is certainly entitled to decide that mandatory arbitration provisions in employment contracts are not fair or that certain kinds of claims should fall outside the reach of the [FAA]."  *Jones v. Halliburton Co.*, 625 F. Supp. 2d 339, 348 (S.D. Tex. 2008), *aff'd and remanded*, 583 F.3d 228 (5th Cir. 2009).

The Supreme Court has held that mandatory arbitration of an ADEA discrimination claim does not prevent a party from vindicating his or her rights, explicitly rejecting the argument that such arbitration can render an arbitration clause unconscionable.  *Gilmer*, 500 U.S. at 26.  In so holding, the Supreme Court found that Congress "did not explicitly preclude arbitration or other nonjudicial resolution of claims, even in its recent amendments to the ADA."  *Id.* at 29 ("[I]f Congress intended the substantive protection afforded to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history.") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

As other courts have held, including the Second Circuit in *Ragone*, that reasoning extends to claims under Title VII and other employment discrimination claims.  *See Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 487 (2d Cir. 2013) ("Congress specifically approved arbitration of Title VII claims in the Civil Rights Act of 1991, expressly stating that the 'use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title.'") (citation omitted); *Gold*, 365 F.3d at 148 ("In *Desiderio*, we . . . conclude[d], along with the majority of other circuits, that Title VII claims could be subject to compulsory arbitration") (citing *Desiderio*, 191 F.3d at 205); *see also Alford v. Dean Witter Reynolds, Inc.*, 939 F.2d 229, 230 (5th Cir. 1991) ("Title VII claims can be subjected to compulsory arbitration.  Any broad public policy arguments against such a conclusion were necessarily rejected by *Gilmer*").[11]  Like with her Title VII claims, Plaintiff also has not shown that "Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights" under the ADA.  *Mitsubishi*, 473 U.S. at 628; *see Gilmer*, 500 U.S. at 26 (stating the burden is on the party seeking to invalidate the arbitration clause).

Plaintiff's arguments as to state law and public policy as a means for invalidating the arbitration clause as unconscionable also "do not change the fact that [Plaintiff] entered into a valid arbitration agreement which explicitly covered claims" brought here.  *Chatziplis v.*

---

[11] *Cf. Circuit City*, 532 U.S. at 123 ("The Court has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law[.]"); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (internal citations omitted) (stating the FAA "establish[es] a liberal federal policy favoring arbitration agreements," which "requires courts to enforce agreements to arbitrate according to their terms . . . even when the claims at issue are federal statutory claims, unless the FAA's mandate has been overridden by a contrary congressional command") (internal quotation marks and citations omitted).

*PriceWaterhouseCoopers LLP*, 2018 WL 3323820, at *5 (S.D.N.Y. July 6, 2018).  As "the

Supreme Court has made clear," the "Federal Arbitration Act 'leaves no place for the exercise of

discretion by a district court, but instead mandates that district courts shall direct the parties to

proceed to arbitration on issues as to which an arbitration agreement has been signed.'"  *Id.*

(quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)); *see also McLaughlin v.

MacQuarie Cap. (USA) Inc.*, 2018 WL 3773992, at *3 (S.D.N.Y. Aug. 7, 2018) (compelling

arbitration of sexual harassment claims under Title VII, NYSHRL, and NYCHRL).

In *Marmet*, the Supreme Court reversed a decision by the West Virginia court that held

the FAA did not preempt the "state public policy against predispute arbitration agreements that

apply to claims of personal injury or wrongful death against nursing homes."  *Marmet Health

Care Ctr., Inc. v. Brown*, 565 U.S. 530, 532 (2012).  The Supreme Court held that the "West

Virginia court's interpretation of the FAA was both incorrect and inconsistent with clear

instruction in the precedents of this Court" because the FAA, which applied to the arbitration

clause, "includes no exception for personal-injury or wrongful-death claims."  *Id.*  That holding

was consistent with other decisions by the Supreme Court to refuse to invalidate such clauses

based on state law or public policy that conflict with the FAA.  *See, e.g.*, *Concepcion*, 563 U.S.

at 341 (overturning California Supreme Court's decision in *Discover Bank* that had held

California public policy prohibited the enforcement of class action waivers as unconscionable);

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006) (rejecting Florida Supreme

Court's conclusion that enforceability of the arbitration agreement should turn on Florida public

policy and contract law).[12]

---

[12] *See also* Andrea Doneff, *Is* Green Tree v. Randolph *Still Good Law? How the Supreme
Court's Emphasis on Contract Language in Arbitration Clauses Will Impact the Use of Public
Policy to Allow Parties to Vindicate Their Rights*, 39 Ohio N.U. L. Rev. 63, 85 (2012)

As to Plaintiff's second set of arguments under substantive unconscionability, the test is "whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *In re FirstMerit Bank*, 52 S.W.3d at 757; *see also In re Poly-Am.*, 262 S.W.3d at 348 ("Unconscionability is to be determined in light of a variety of factors, which aim to prevent oppression and unfair surprise; in general, a contract will be found unconscionable if it is grossly one-sided.").

Contrary to Plaintiff's assertion, the arbitration clause is not one-sided as it requires each party to "submit all disputes Employee might have against the Company, and all disputes the Company might have against Employee to final, binding arbitration to the fullest extent permitted by law. Dkt. No. 31-5 § 11. Thus, if Indeed had a claim against Plaintiff, whether for breach of her duties or any other misconduct, it would be required to arbitrate. It would be denied a public forum. The fact that the arbitration clause is invoked because it is Plaintiff who has a claim against Indeed and not Indeed that has a claim against Plaintiff does not make the clause unenforceable. The enforceability of the arbitration clause thus does not turn on whether the employer would ever have a discrimination and sexual harassment claim against the employee. It is mutual and two-sided because Indeed might have other disputes with its employees and would be required to arbitrate those just as Plaintiff is required to arbitrate her disputes with Indeed.

Plaintiff also argues that because she was required to sign the Confidentiality Agreement in 2019, four years after her rape, she was denied the right to proceed in court on her pending

(describing *Stolt-Nielsen* and *Concepcion* as "reject[ing] the idea that public policy behind state law could be used either to interpret the parties' intent or to find an arbitration clause unconscionable").

sexual harassment claim. *Id.* But the case on which Plaintiff relies, *Brennan*, is distinguishable. The court there held that the arbitration clause was substantively unconscionable because of two provisions, the combination of which made the arbitration clause unreasonably favorable to the employer: First, the contract allowed the employer (but not the employee) to modify its terms unilaterally at any time thus binding the employee to a contract he or she may never have seen; and second, it denied the plaintiff the right to proceed in court on a pending sexual harassment claim she had against the company. *See Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 384 (S.D.N.Y. 2003). Plaintiff has not cited a single case, and the Court is aware of none, that would preclude a would-be plaintiff and would-be defendant—after a claim has accrued—to decide to resolve their dispute through private arbitration or that would render such an agreement substantively unconscionable and therefore unenforceable.

> **b.      "Failure to Comply" Provision**

Plaintiff argues that the "Failure to Comply" provision in the arbitration agreement is substantively unconscionable because it affects her substantive rights under Title VII to recover attorneys' fees as the prevailing policy.

The "Failure to Comply" provision provides that should either Indeed or the employee initiate a litigation or administrative proceeding with respect to any claim required to be submitted to arbitration and thereafter refuse to proceed to arbitration, the responding party is entitled to recover from the initiating party all costs, expenses, and attorneys' fees incurred in connection with a motion or petition to compel arbitration, regardless of the outcome of the motion or petition. Dkt. No. 31-5 § 11(d). It also provides that if the court compels arbitration, the party seeking that order is entitled to its attorney's fees and costs incurred in pursuing that order or petition. The provision is mutual in the sense that it applies equally to Indeed and to the employee if either is the initiating party. *Id.* § 11(e)(5). But it is not neutral with respect to

arbitration.  A party who seeks arbitration is entitled to its costs, fees and expenses if it prevails on the motion to compel (and maybe even if it does not).  A party who resists arbitration and desires to litigate is not entitled to its costs, fees or expenses even if that party prevails and the court determines the matter should not be arbitrated.

Plaintiff's opposition to arbitration can be understood to raise two separate arguments: (1) under federal law, that the agreement to arbitrate is not enforceable since the terms of the agreement deprive Plaintiff of statutory remedies to which she would have been entitled if the case were litigated in federal court; and (2) under state law, the agreement is substantively unconscionable because it precludes Plaintiff from enforcing her rights in arbitration.  *See Ragone*, 595 F.3d at 124-25 (discussing both arguments).  The arguments raise serious issues in theory, but they do not assist Plaintiff here.  The "Failure to Comply" provision is severable and, in any event, the Indeed Defendants have agreed to forego any relief pursuant to it.

The Supreme Court has held that "statutory claims may be the subject of an arbitration agreement," so long as the arbitration agreement preserves the ability of the plaintiff to pursue the statutory remedies in arbitration that she would be permitted to pursue in court.  *Id.* at 125 (quoting *Gilmer*, 500 U.S. at 26).  "[I]f certain terms of an arbitration agreement served to act 'as a prospective waiver of a party's right to pursue statutory remedies . . . [the court] would have little hesitation in condemning the agreement as against public policy.'"  *Id.* (quoting *Mitsubishi*, 473 U.S. at 637 n.19).

Thus, the Second Circuit affirmed the district court's ruling compelling arbitration of an employment dispute in *Ragone* only "with something less than robust enthusiasm" and only because the defendant had waived provisions in the arbitration agreement that awarded attorneys fees to the prevailing party and that significantly shortened the statute of limitations.  The court

noted that a court will compel arbitration "only if it is clear that 'the prospective litigant effectively may vindicate its statutory claim in the arbitral forum,'" *id.* at 125 (quoting *Mitsubishi*, 473 U.S. at 637), that Title VII permits the award of attorneys' fees to a prevailing defendant only if the plaintiff's claim is "frivolous, unreasonable, or groundless,'" and that "[p]ursuant to this standard . . . 'it is very rare that victorious defendants in civil rights cases will recover attorneys' fees,'" *id.* at 126 (quoting *Sista v. CDC Ixis N. Am, Inc.*, 445 F.3d 161, 178 (2d Cir. 2006)).  Absent defendants' agreement to waive the provisions at issue, including the attorneys' fees provision, the Second Circuit stated, "it is not clear that we would hold in [defendants'] favor." *Id.* at 125.

Although the arbitration clause here is not identical to the clause in *Ragone*, the reasoning of *Ragone* applies by extension here.  There is no reason to believe that Congress intended for a plaintiff who takes an ultimately losing but not unreasonable position with respect to the forum in which to bring suit to be subject to an attorneys' fees award, just as Congress does not impose such fees on a plaintiff who takes any other reasonable but ultimately unsuccessful legal or factual position.[13]  Plaintiff brought her claim under Title VII here because the statute gave her a right to do so.  She filed an EEOC complaint and there is no argument that she did not exhaust her administrative remedies.  The attorneys' fees provisions of Title VII were enacted "broadly, to encourage individuals injured by . . . discrimination to seek judicial relief." *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968) (discussing Title II); *see Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 418 (1977) ("[A]s emphasized so forcefully in *Piggie Park*, the plaintiff [in a Title VII case] is the chosen instrument of Congress to vindicate "a policy that

---

[13] A plaintiff unsuccessful on the merits because of a position that is "frivolous, unreasonable, or groundless" may be required to pay attorneys' fees but Defendants here do not contend that Gilbert's position is unreasonable.

Congress considered of the highest priority."). Congress intended plaintiffs to act as private attorneys general, vindicating not only a personal interest but also a general societal interest. *See Piggie Park*, 390 U.S. at 401 ("When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law."). "If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts." *Id.* at 402. Thus, absent the arbitration agreement, by filing in federal court Plaintiff would be entitled to the full statutory remedies provided by Title VII. She would be entitled to attorneys' fees if she prevailed and, in order to encourage her to seek judicial relief, she would be required to pay her adversary's attorneys' fees only if her claim were "frivolous, unreasonable, or groundless." *Christiansburg*, 434 U.S. at 421.

The effect, under the "Failure to Comply" provision, of an order compelling arbitration of Plaintiff's Title VII statutory rights and remedies under Title VII is every bit as great in kind, if not in magnitude, as under the arbitration agreement in *Ragone*. Under *Christiansburg*, Plaintiff is entitled to attorneys' fees if she prevails in this litigation. But, under the provision, if she loses in this Court on the motion to compel, she will have to pay her adversary's fees, not because her claims or her legal positions are "frivolous, unreasonable, or groundless" (on their face, they are not), but because she has not won. The fees she will have to pay presumably may not be as large as those in *Ragone* (which involved fees for litigating the claim on the merits), but the insult to her statutory rights are every bit as great. Congress's objective "to encourage litigants injured by . . . discrimination to seek judicial relief," *Piggie Park*, 390 U.S. at 402, would be defeated. A fee-shifting provision "significantly diminish[es] a litigant's rights under Title VII." *Ragone*,

595 F.3d at 126.[14]  If the Second Circuit found the arbitration clause in *Ragone* problematic, the clause here is equally problematic.

Plaintiff's argument to resist arbitration here on these grounds, however, fails for the same reason that the claim of the plaintiff in *Ragone* failed.  The *Ragone* court declined to find the arbitration agreement unenforceable because defendant had waived the enforcement of its problematic portions.  Plaintiff "herself ha[d] not been chilled in asserting her Title VII rights." *Ragone*, 595 F.3d at 126.  Because the Indeed Defendants have waived the "Failure to Comply" provision, the same rationale requires that Plaintiff's argument be rejected here as well.

Second, Plaintiff argues that the provision makes the arbitration provision substantively unconscionable as a matter of Texas state law.  "Arbitration provisions relating to federal statutory claims are not enforceable 'when a party is forced to forgo the substantive rights afforded by the statute,' as opposed to merely 'submit[ting] to resolution in an arbitral, rather than a judicial, forum.'"  *Coronado v. D.N. W. Hous., Inc.*, 2015 WL 5781375, at *9 (S.D. Tex. Sept. 30, 2015) (quoting *In re Poly–Am*, 262 S.W.3d at 349).  For example, contracts with a fee-shifting provision that allows defendant to recover attorneys' fees in FLSA actions regardless of

---

[14] *See also Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 203 (3d Cir. 2010) (arbitration agreement's "restriction on the arbitrator's ability to award attorney's fees, costs, and expenses [to the plaintiffs was] substantively unconscionable" because it "undermine[d] the legislative intent behind fee-shifting statutes like Title VII"); *Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 216 (3d Cir. 2003) ("[T]he proviso requiring each party to pay its own attorney's fees—regardless of the outcome of the arbitration—runs counter to statutory provisions under Title VII and ADEA that permit an award of attorney's fees and costs to a prevailing party."); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 673 n.15 (6th Cir. 2003) ("If arbitration is to offer claimants the full scope of remedies available under Title VII, arbitrators in Title VII cases, just like courts, must be guided by *Christiansburg* and must ordinarily grant attorney fees to prevailing claimants rather than be restricted by private contractual language."); *cf. Hackwell v. United States*, 491 F.3d 1229, 1240 (10th Cir. 2007) ("Title VII's fee-shifting provision, 42 U.S.C. § 2000e–5(k), was intended to encourage private citizens to enforce the statute's guarantees and that if successful plaintiffs were forced to bear their own attorneys' fees, few aggrieved parties would be in the position to advance the public interest.").

which party prevails have been held to be unconscionable because of the FLSA's similar requirement that prevailing plaintiffs recover their attorneys' fees. *See id.* (citing cases). Thus, assuming that the arbitration provision forced Plaintiff to forego her substantive right to litigate free from the fear that if she lost she would have to pay her opponent's attorneys' fees, the clause might be unenforceable.

Once again, however, the combination of *Ragone* and the Indeed Defendants' waiver of the attorney fee provision are fatal to Plaintiff's argument. "Because unconscionability is an equitable defense to the enforcement of harsh or unreasonable contract terms, a party cannot complain when the defendant through its waivers declines to enforce any potentially unconscionable term." *Ragone*, 595 F.3d at 124 (internal citation omitted).[15]

Moreover, the Confidentiality Agreement contains a severability provision: "If one or more of the provisions in this Agreement are deemed void or voidable under applicable law, then the remaining provisions will continue in full force and effect." Dkt. No. 31-5 § 14. Although that provision is not unique to the arbitration clause but constitutes a separate section of the Confidentiality Agreement as a whole, there is no doubt that it applies to the arbitration clause and reflects the parties' intent to preserve any unobjectionable provisions of the arbitration clause even if portions of that clause are objectionable: it refers to "one or more of the provisions" in the Confidentiality Agreement, which would include the arbitration clause. *Id.*

Under Texas law, "[a]n illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement." *Venture*

---

[15] Given its holding that the provision is unconscionable with respect to at least the Title VII claims, the Court need not address Plaintiff's argument that the arbitration clause should be invalidated "on the ground that arbitration would be prohibitively expensive." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000); *see* Dkt. No. 42 at 36-37.

*Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 230 (Tex. 2014) (quoting *In re Poly-Am.*, 262

S.W.3d at 360). "In determining an agreement's essential purpose, the issue is 'whether or not

parties would have entered into the agreement absent the unenforceable provisions.'"  *Id.*

(quoting *In re Poly-Am.*, 262 S.W.3d at 360).

      The essential purpose of the Confidentiality Agreement is three-fold: it requires

confidentiality, prohibits the use or disclosure of proprietary information, and refers covered

claims to arbitration.  All of those interests are satisfied without the "Failure to Comply"

provision.  The Confidentiality Agreement still ensures confidentiality as to the subjects covered

by it; Plaintiff is still subject to confidentiality requirements even if she brings litigation or

litigates her right to bring an action in court.  She still is prohibited from using or disclosing

proprietary information improperly.  Finally, "Covered Claims" will be referred to arbitration if

required by the FAA or state law.  It is not necessary also to charge Plaintiff with Indeed's costs

and expenses in order to satisfy those interests.  Because the arbitration provision can stand

without the "Failure to Comply" provision, any defect in the "Failure to Comply" provision does

not require the Court also to strike the arbitration provision.  *See Hadnot v. Bay, Ltd.*, 344 F.3d

474, 478 (5th Cir. 2003) ("The purpose of the arbitration provision is to settle any and all

disputes arising out of the employment relationship in an arbitral forum rather than a court of

law.  Even with its unlawful limitation on the types or permissible damage awards lifted . . . the

arbitration clause remains capable of achieving this goal."); *see also Ragone,* 595 F.3d at 124-25

(stating that the New York Court of Appeals "directs that 'the appropriate remedy' when a court

is faced with a plainly unconscionable provision of an arbitration agreement—one which by

itself would actually preclude a plaintiff from pursuing her statutory rights—'is to sever the

improper provision of the arbitration agreement, rather than void the entire agreement.'") (citation omitted).[16]

### 2.  Procedural Unconscionability

Plaintiff further argues that the Confidentiality Agreement is also procedurally unconscionable because she had no opportunity to negotiate her employment documents or to opt-out from the arbitration clause, and she did not have counsel when reviewing the documents nor did Indeed advise her of Section 7515.

Plaintiff's argument regarding procedural unconscionability fails as well.  To find an agreement procedurally unconscionable, "the circumstances surrounding the negotiations must be shocking."  *Delfingen*, 407 S.W.3d at 798.  "The only cases under Texas law in which an agreement was found procedurally unconscionable involve situations in which one of the parties appears to have been incapable of understanding the agreement."  *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1077 (5th Cir. 2002); *see Carrillo*, 2020 WL 5517200, at *8 (stating same); *see also BBVA Compass Inv. Sols., Inc. v. Brooks*, 456 S.W.3d 711, 724 (Tex. App. 2015) ("Situations that are procedurally unconscionable involve those in which one of the parties was incapable of understanding the agreement without assistance, and the other party did not provide that assistance, such as where one of the parties was functionally illiterate or where one of the parties did not speak English.").

---

[16] Plaintiff cites only one case in which the Eleventh Circuit refused to sever a fee-shifting provision.  Dkt. No. 42 at 32.  But the arbitration agreement at issue in that case did not contain a severability provision, which was critical to the Eleventh Circuit's decision, because the Eleventh Circuit had "has previously rejected the contention that the policy favoring arbitration agreements requires that courts sever unlawful provisions, rather than void the agreement."  *See Perez v. Globe Airport Sec. Servs., Inc.*, 253 F.3d 1280, 1286 (11th Cir. 2001), *vacated on other grounds*, 294 F.3d 1275 (11th Cir. 2002).  Even so, "the Texas Supreme Court and the Fifth Circuit have allowed severance of an unconscionable term without requiring a severability clause."  *The Shipman Agency, Inc. v. TheBlaze Inc.*, 315 F. Supp. 3d 967, 975 (S.D. Tex. 2018).

A "take it or leave it" contract does not render an arbitration clause unconscionable.  *See In re Halliburton Co.*, 80 S.W.3d at 572 (holding an arbitration agreement was not unconscionable simply because an employer made a "take it or leave it" offer to its at-will employees); *Wynne v. Am. Express Co.*, 2010 WL 3860362, at *8 (E.D. Tex. Sept. 30, 2010) (rejecting argument that "take it or leave it" contracts are inherently unconscionable and stating "unconscionability principles should only be applied to prevent unfair surprise or oppression, not to negate a bargain simply because one party to the agreement may have been in a less advantageous bargaining position"); *see also Gilmer*, 500 U.S. at 33 ("Mere inequality in bargaining power" is not a basis for declining to enforce arbitration agreements contained in employment contracts).  Plaintiff does not say that Indeed prevented her from obtaining counsel to review the documents.  Instead, she states that she chose to "review[] these documents for a total of only approximately 15 minutes before signing, since [she] had been made to understand that [she] had to sign them as a condition of employment."  Dkt. No. 43 ¶ 7.  Plaintiff does not submit evidence that it was Indeed that pressured her to sign the documents in 15 minutes, nor does she state how much time she was given to contemplate the documents.  In any event, courts have found that "pressure to sign the documents quickly" is "insufficient to establish unconscionability."  *Fleetwood Enters.*, 280 F.3d at 1077 (noting that although "there may be imbalance in the relative sophistication of the parties, this imbalance is insufficient on its own to render the agreement unconscionable").  Nor can Plaintiff argue that she did not see the arbitration clause or the fee-shifting provision when she reviewed and ultimately signed the documents.  *See, e.g.*, *Lucchese Boot Co. v. Licon*, 473 S.W.3d 390, 403 (Tex. App. 2015) (presuming that a party who "has the opportunity to read an arbitration agreement and signs it, knows its contents").

45

**D.      Arbitrability**

Finally, the Indeed Defendants argue that the dispute falls within the scope of the arbitration clause because it delegated questions regarding arbitrability to the arbitrator.  The Court therefore must determine whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate and whether the dispute does fall within the scope—the question of arbitrability.  *See AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-50 (1986).  If the parties evidenced a "clear and unmistakable" intent to submit the dispute to an arbitrator, then the Court shall delegate the third question to the arbitrator.  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).  "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."  *Id.*; *see also Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) (questions of arbitrability "should be decided by the courts unless there is clear and unmistakable evidence from the arbitration agreement" that the parties intended the dispute to be decided by the arbitrator) (citation and internal quotation marks omitted).

Under the arbitration clause in the Confidentiality Agreement, the question of whether the dispute should be arbitrated falls within the power of the arbitrators to decide.  "Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'"  *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (citation omitted).  This is so because "[w]hen parties use expansive language in drafting an arbitration clause, presumably they intend all issues that touch matters within the main agreement to be arbitrated."  *Id.* at 225.

The arbitration clause covers "any claims, including but not limited to claims known or accrued as of the date of execution of this Agreement, under applicable local, state or federal law

that any current or former employee might have against the Company that arise out of and/or are ancillary to the employment relationship." Dkt. No. 31-5 § 11(b).  There is "clear and unmistakable evidence" that the arbitration clause delegates the question of arbitrability to the arbitrator.  *Henry Schein*, 139 S. Ct. at 530.

Moreover, the arbitration clause explicitly incorporates the rules under Judicial Arbitration and Mediation Services, Inc. ("JAMS"), or, if no JAMS office serves the venue where the arbitration is to take place, under the American Arbitration Association ("AAA"). Dkt. No. 31-5 § 11(e).  JAMS Rule 11(b) provides that "the Arbitrator has the authority to determine . . . arbitrability issues as a preliminary matter."  Dkt. No. 32 at 12.  The AAA Rules similarly state: "[If a] party . . . object[s] to the jurisdiction of the arbitrator or to the arbitrability of a claim . . . , [t]he arbitrator may rule on such objections as a preliminary matter or as part of the final award."  *Id.*

The arbitration clause thus vests in the arbitrator the decision whether this dispute falls within the scope of the arbitration clause.  "[A] signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules" may not "disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability."  *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 211 (2d Cir. 2005); *see also Jacobs v. U.S. Anti-Doping Agency*, 2004 WL 5003951, at *4 (S.D.N.Y. May 19, 2004) (where arbitration provision incorporated AAA rules, "the parties . . . agreed that all questions regarding the existence, validity, and scope of their arbitration agreement should be decided by an AAA arbitrator rather than by a court"), *aff'd sub nom. Jacobs v. USA Track & Field*, 374 F.3d 85 (2d Cir. 2004).  The arbitration clause also provides a procedure by which, "if the dispute cannot be resolved informally through internal human resource channels," the complaining party is directed to submit the matter to JAMS or the

AAA, as opposed to the Court.  *See* Dkt. No. 31-5 § 11(e).  Indeed, the now-stricken "Failure to Comply" provision was to prevent the involvement of the courts in the arbitration clause.  The Court thus sends the claims to the arbitration panel to determine whether the claims are properly within the scope of the arbitration clause.

Accordingly, the motion to compel arbitration is granted.  Given the Court's decision to refer the parties to arbitration, the motion to dismiss for failure to state a claim is denied as moot.

## II.     Schwartz's Motion to Dismiss and/or Compel Arbitration

Schwartz moves to dismiss the complaint against him pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction.  In the alternative, he seeks to join his co-defendants motion to compel arbitration or, if the motion to compel is not granted as to him, to dismiss the ninth and tenth causes of action against him for failure to state a claim pursuant to Rule 12(b)(6).

### A.     Personal Jurisdiction

New York's general jurisdiction statute provides for jurisdiction over "persons, property, or status as might have been exercised heretofore."  N.Y. C.P.L.R. § 301.  A defendant is subject to personal jurisdiction if he is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence' in this jurisdiction."  *Laufer v. Ostrow*, 434 N.E. 692, 694 (1982) (quoting *McGowan v. Smith*, 419 N.E.2d 321, 323 (1981)).  However, an employee who is engaged in business in the state "does not subject himself, individually, to the CPLR 301 jurisdiction of [New York] courts unless he is doing business in our State individually."  *Id.* at 696; *see Wallace Church & Co. Inc. v. Wyattzier, LLC*, 2020 WL 4369850, at *5 (S.D.N.Y. July 30, 2020) (holding that jurisdiction under N.Y. C.P.L.R. § 301 did not lie where conduct of individual defendants in New York was within their role as corporate principals); *Brinkmann v. Adrian Carriers, Inc.*, 815 N.Y.S.2d 196, 199 (2d Dep't 2006) ("An

individual cannot be subject to jurisdiction under CPLR 301 unless he is doing business in New York as an individual rather than on behalf of a corporation.").[17]

New York's specific jurisdiction statute states that "a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent":

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a).

"Unlike CPLR § 301, CPLR § 302 allows courts to exercise specific jurisdiction over corporate principals based on transactions made or acts taken in a corporate capacity." *Wallace Church*, 2020 WL 4369850, at *6; *see Retail Software Servs. Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988) (upholding long-arm jurisdiction over corporate employees who were the "primary actors" in the transaction in New York that was the source of the litigation) (citing *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 47 (1988)).

Plaintiff brings six claims against Schwartz: sexual harassment under the NYCHRL (Count III) and NYSHRL (Count IV); aiding and abetting Indeed's gender harassment

---

[17] Plaintiff does not seriously argue for general jurisdiction under N.Y. C.P.L.R. § 301, instead saying in a footnote that "[d]iscovery may demonstrate grounds for general jurisdiction over Schwartz under CPLR § 301." Dkt. No. 55 at 27 n.10.

discrimination and retaliation under the NYSHRL and NYCHRL (Count V); violation of N.Y. Labor Law § 194 (Count VIII); rape in violation of the N.Y. Penal Law § 130.35 pursuant to N.Y. C.P.L.R. § 213-c (Count IX); and gender-motivated rape in violation of the GMVA (Count X).

### 1.    Section 302(a)(1)

To establish jurisdiction under N.Y. C.P.L.R. § 302(a)(1), Plaintiff must allege that: (1) Schwartz has "transacted business" in New York, and (2) the claim asserted arises from that business activity. *Eades v. Kennedy PC L. Offs.*, 799 F.3d 161, 168 (2d Cir. 2015); *see Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013).

Under the first prong, a non-domiciliary defendant need not be physically present in New York to "transact business," so long as the defendant has engaged in "purposeful activity," for example, "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246-47 (2d Cir. 2007) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The Court looks to the "quality" and not the quantity of the contacts. *Fischbarg v. Doucet*, 880 N.E.2d 22, 26-27 (2007) (purposeful activity where defendant attempted to establish relationship through calls, faxes and emails projected into New York over months).

Defendant Schwartz has worked in the Austin office of Indeed at all times and has lived in Austin for the past six years. Dkt. No. 49-2 ¶ 1. Plaintiff alleges only three contacts New York: Plaintiff "believ[ed]" she saw Schwartz in the New York office in February 2016, Compl. ¶ 59, Indeed sent Schwartz to the New York office in October 2019, *id.* ¶ 74, and Schwartz, while in Texas, sent a LinkedIn invitation to Plaintiff, while in New York, on September 24,

2019, *id.*[18]  Schwartz also admits that beginning in the fall of 2016, he was required to report, through bi-weekly phone meetings, to a manager in New York and thereafter, visited Indeed's New York office two to three times per year over the next four years for team trainings or the occasional in-person meeting.  Dkt. No. 62 ¶ 11.

Schwartz did not purposefully avail himself of the privilege of conducting activities in New York when he invited Plaintiff to connect via LinkedIn.  A user can request to connect with another user via LinkedIn in different ways.  One way is by searching for another user's profile, which may or may not list where the user is located, and clicking "Connect."  Another method of connection, which Schwartz asserts occurred here, is through LinkedIn's feature that suggests other LinkedIn users based on commonalities between users.  *See id.* ¶ 13.  In that instance, the user does not search for the other user, but rather LinkedIn recommends the connection based on an algorithm.  In both methods, LinkedIn, not the requesting user, sends an email to the requested user informing him or her of the invitation request.

The "advent of the internet" has created "a new set of challenges" regarding personal jurisdiction.  *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000).  The Second Circuit has remarked that the framework advanced in *Zippo Manufacturing Company v. Zippo Dot Com, Inc*., 952 F.Supp. 1119 (W.D.Pa. 1997), "may help frame the jurisdictional inquiry" in personal jurisdiction cases involving the internet.  *Best Van Lines*, 490 F.3d at 252.  The *Zippo* court described a sliding scale, based on the degree to which users could interact with a particular website:

---

[18] For the first time in her opposition brief, Plaintiff also states that during the October 2019 trip, "as part of his harassment of Ms. Gilbert in New York, Schwartz sent a print job to the printer on Ms. Gilbert's floor in the New York office closest to her desk."  Dkt. No. 55 at 10; *see* Dkt. No. 57 ¶ 11.  Plaintiff does not state whether she interacted with Schwartz, and Schwartz maintains that he had no contact with her.  Dkt. No. 49-2 ¶ 9.

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Zippo*, 952 F. Supp. at 1124 (citations omitted).

The LinkedIn invitation falls somewhere in the middle of the spectrum.  LinkedIn permits the passive display of the employment history of its users, but it can also be used interactively, such as by allowing users to seek job opportunities, post news articles, or comment on others' announcements.  Social media sites, such as LinkedIn and Facebook, may offer the opportunity to "seek[] out and initiate[] contact with New York, solicit[] business in New York, and establish[] a continuing relationship," such as, for example, when a user connects to a company on LinkedIn in order to seek employment.  *Paterno v. Laser Spine Inst.*, 23 N.E.3d 988, 993 (2014); *see Fischbarg*, 880 N.E.2d at 27.

Key here, however, is that there is no evidence that Schwartz, by his invitation to establish a social media relationship over LinkedIn, intended to do anything other than be able to view Plaintiff's profile and to display Plaintiff as a listed connection on his webpage.  Although the act of sending a LinkedIn invitation "is not wholly passive because it is not limited to making information available," it "is also not conducting traditional business over the internet because it is not selling goods or services, or charging membership fees to registered users."  *Weiss v. Barc, Inc.*, 2013 WL 2355509, at *4 (S.D.N.Y. May 29, 2013); *see Panacea Sols., Inc. v. Roll*, 2006 WL 3096022, at *3 (S.D.N.Y. Oct. 31, 2006) ("Even advertisements that target New Yorkers are

not sufficient unless 'supplemented by business transactions occurring in the state . . . or . . . accompanied by a fair measure of the defendant's permanence and continuity in New York which establishes a New York presence.'") (citation omitted).[19]  This holding is consistent with those courts that "have declined to extend jurisdiction over defendants simply on the basis of telephone calls and other communications sent to New York" unless the "purpose of the calls is for the defendant to actively participate in business in New York." *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 420 (S.D.N.Y. 2010); *see Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 788 (2d Cir. 1999).

The mere invitation to connect through a social media platform cannot, by itself, confer personal jurisdiction over a defendant because an invitation alone does not represent "purposeful availment" of "the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson*, 357 U.S. at 253; *see Girl Scouts of U.S. v. Steir*, 102 F. App'x 217, 219 (2d Cir. 2004) ("[Defendants' website] manifested no intent specifically to target New York supporters or to avail themselves of the particular benefits of New York law," even if it "may reach New York residents").  And "[t]o the extent Plaintiff would argue

---

[19] *Cf. Sec. & Exch. Comm'n v. PlexCorps*, 2018 WL 4299983, at *14 (E.D.N.Y. Aug. 9, 2018) ("The mere creation and use of a Facebook account does not by itself confer specific personal jurisdiction over all cases. Because Facebook accounts do not intrinsically implicate commercial activity, they do not evince purposeful availment 'of the privilege of doing business' in the forum to the same extent as the financial payment services discussed above."); *see also DH Servs., LLC v. Positive Impact, Inc.*, 2014 WL 496875, at *5 (S.D.N.Y. Feb. 5, 2014) (the advertisement of events through a Facebook page that permitted users to confirm attendance did not confer personal jurisdiction because it did not amount to the "transaction" of business); *Lyons v. Rienzi & Sons, Inc.*, 856 F. Supp. 2d 501, 509 (E.D.N.Y. 2012) (company's Facebook page that was accessible to New York users did not confer personal jurisdiction since company did not transact business); *Pitbull Prods., Inc. v. Universal Netmedia, Inc.*, 2008 WL 1700196, at *6 (S.D.N.Y. Apr. 4, 2008) (finding jurisdiction lacking under § 302(a)(1) where defendant's website contained only message boards and a blog and did not permit users to purchase goods or services); *Seldon v. Direct Response Techs., Inc.*, 2004 WL 691222 (S.D.N.Y. Mar. 31, 2004) ("Interactive message boards alone do not give rise to long-arm jurisdiction.").

that Defendant's 'national web presence' targets New York, such national presence, standing alone, is insufficient to support the exercise of personal jurisdiction." *Guglielmo v. Neb. Furniture Mart, Inc.*, 2020 WL 7480619, at \*9 (S.D.N.Y. Dec. 18, 2020).  Instead, such availment is incidental.[20]

A social media user may have hundreds of connections and may thereafter ignore such connections once the request to connect is accepted.  Such a user cannot be subject to personal jurisdiction of the residence of each state in which their connections reside.  Moreover, the location displayed for each social media user is selected by that user—whether the location of that user is accurate or not.  Thus, if a user in Texas requested to connect with a user who represented she lived in New York, but in fact lived in Connecticut, would the Texas user be said to have purposefully availed itself of the privileges of conducting activities in New York or Connecticut?  That situation is less clear than the cases where it is undisputed that New York is the forum state at issue, such as when a company ships products to a state in New York or a known New York user accesses a website.

Schwartz's infrequent trips to New York for Indeed trainings or phone calls with his manager also cannot serve as a basis for personal jurisdiction.  "A defendant may not be subject to jurisdiction based on 'random,' 'fortuitous,' or 'attenuated contacts.'" *Moore v. Publicis Groupe SA*, 2012 WL 6082454, at \*7 (S.D.N.Y. Dec. 3, 2012) (citing *Burger King v. Rudzewicz.*

---

[20] If Plaintiff was the only user with whom Schwartz had engaged on social media, or if Schwartz connected with Plaintiff in order to engage in some purposeful activity beyond mere connection, the Court's analysis might well be different.  *See Alcon Labs., Inc. v. Lens.com, Inc.*, 2019 WL 254038, at \*3 (E.D.N.Y. Jan. 17, 2019) (personal jurisdiction where defendant made sales to customers in New York and engaged with New York customers on social media); *PlexCorps*, 2018 WL 4299983, at \*15 (personal jurisdiction where "Facebook accounts were integral to finding investors and directing statements at them to encourage them to participate in the alleged fraudulent scheme").  But the facts do not present that question for the Court's decision here.

471 U.S. 462, 475 (1985)).  "The contacts must provide a fair warning to defendant of the

possibility of being haled into court in the forum state."  *Moore*, 2012 6082454, at *7.  Indeed is

alleged to be a Delaware corporation with offices throughout the United States, including New

York, Connecticut, and Texas, but it is not alleged to have its headquarters in New York or to be

specifically New York-based.  Schwartz lived in Texas, worked at the Austin office, was

assigned to the "south central" and "central" regions, which included the southern and

midwestern states but not New York, and did not service or solicit customers or clients in New

York.  Dkt. No. 62.  At the time he joined Indeed, his manager was also based in Austin.  *Id.*  It

was only in the fall of 2016 that Indeed assigned him to report to a manager in New York by

phone, and in connection with that assignment and certain team trainings did he visit New York

occasionally over the next four years.  *Id.*  These contacts, which touch upon New York not by

Schwartz's design or purposeful availment but casually and as a by-product of his assignment to

a new manager, distinguish this case from others in which defendants "have interacted with their

employer's New York headquarters, accessed data maintained by their employer in New York,

availed themselves of the benefit of being employed by a New York company, and generated

profits for a New York company."  *Mercator Risk Servs., Inc. v. Girden*, 2008 WL 5429886, at

*3 (S.D.N.Y. Dec. 30, 2008).  The cases cited by Plaintiff are similarly inapposite because they

involved a substantial and continuing relationship with New York, including directly with the

plaintiffs in those cases.  Dkt. No. 55 at 20-22; *see Payne v. McGettigan's Mgmt. Servs. LLC*,

2020 WL 2731996, at *1 (S.D.N.Y. May 26, 2020) (defendant owned a bar in New York at

which plaintiff was employed and which defendant routinely visited to manage its business);

*Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 359 (S.D.N.Y.

2007) (defendants sent work assignments to plaintiff in New York); *Gibson-Hawley v. USA*

*Mgmt. LLC*, 2018 WL 4691576, at *4 (E.D.N.Y. Sept. 14, 2018) (defendant supervised and controlled plaintiff's employment in New York).  The same reasoning applies to Schwartz's February 2016 visit to New York.[21]

Taken together, Schwartz's alleged contacts do not establish that he purposefully availed himself of the privileges of conducting activities in New York, and thus the Court need not reach the second element of whether there is "some articulable nexus between the business transacted and the cause of action sued upon or where there is a substantial relationship between the transaction or the claim asserted."  *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006).

### 2. Section 302(a)(2)

Section 302(a)(2) provides for jurisdiction over a defendant who "commits a tortious act within the state."  N.Y. C.P.L.R. § 302(a)(2).

The rape did not occur "within the state" of New York and thus Counts IX and X, as well as the sexual harassment claims based on the rape, cannot establish personal jurisdiction over Schwartz pursuant to this section.  *See Sunward Elecs., Inc v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (a "plaintiff must establish the court's jurisdiction with respect to each claim asserted"); *see also Wilson v. Danka Corp.*, 2002 WL 31929120, at *3 (S.D.N.Y. Jan. 28, 2003)

---

[21] In addition, Plaintiff's "belief" as to Schwartz's visit to New York in February 2016 is also insufficient to meet her burden of establishing jurisdiction.  *See Zanotti v. Invention Submission Corp.*, 2020 WL 2857304, at *16 (S.D.N.Y. June 2, 2020) ("Conclusory allegations showing the presence of jurisdiction, particularly those stated only upon information and belief, are insufficient to establish that the court has personal jurisdiction over the defendant.") (quoting *Guo Jin v. EBI, Inc.*, 2008 WL 896192, at *2 (E.D.N.Y. March 31, 2008)).  Schwartz has also denied, in a sworn declaration, that he was in the New York office in February 2016, which Plaintiff does not rebut.  Dkt. No. 62 ¶ 11.

("The fact that the consequences of these alleged acts may have continued in New York does not make New York the site of the tort.").

As to Plaintiff's remaining claims against Schwartz, Plaintiff has not alleged that the conduct in New York supporting her claims of discrimination and aiding and abetting discrimination constitutes a tortious act.  "There must be some basis for considering the defendant's actions to be tortious, either under the law of New York or some other pertinent jurisdiction." *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 551 (2d Cir. 2007).[22]  Plaintiff argues that Schwartz's presence in the New York office in at least October 2019 and the LinkedIn invitation constituted sexual harassment and/or a hostile work environment under the NYSHRL and NYCHRL because Schwartz visited the office and sent the LinkedIn invitation knowing that this would cause trauma to his rape victim." Dkt. No. 65 at 32:18-21.  But Plaintiff has not explained how these actions make out the elements of a tort under New York or other law.  *See Ehrenfeld v. Bin Mahfouz*, 2006 WL 1096816, at *4 (S.D.N.Y. Apr. 26, 2006) ("Though [plaintiff] contends that [her claim] is 'akin to malicious prosecution or prima facie tort, that is, the intentional infliction of harm by superficially lawful means,' she does not allege the commission of either tort . . . nor does she assert that the elements of either tort have been satisfied.") (citation omitted).

At oral argument, Plaintiff relied on *Holland v. United States*, 469 F. Supp. 2d 67 (E.D.N.Y. 2006) to argue that sexual harassment in violation of the antidiscrimination laws

---

[22] Some courts have held that certain discrimination claims under NYSHRL and NYCHRL cannot establish personal jurisdiction under Section 302(a)(2) because such "discrimination claims are not torts." *Weerahandi v. Am. Stat. Ass'n*, 2015 WL 5821634, at *4 (S.D.N.Y. Sept. 30, 2015) (referring to NYSHRL and NYCHRL); *see also Camacho v. Northeastern Univ.*, 2019 WL 5190688, at *3 n.3 (S.D.N.Y. Oct. 15, 2019); *cf. Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 475 (E.D.N.Y. 2015).

satisfies Section 302(a)(2).  *See* Hr'g Tr. at 34:3-13.  In *Holland*, plaintiffs were tennis umpires

who alleged they were denied opportunities to officiate significant tennis matches on the basis of

their race, sex, and age.  They brought suit against The International Tennis Federation and its

administrator of officiating.  Specifically, the administrator had promoted male umpires he

sexually desired at the expense of other male and female empires, including selecting them to

officiate at U.S. Open in New York, and had conversations with a plaintiff in New York that

were "harass[ing] and retaliatory."  *Holland*, 469 F. Supp. 2d at 77.  The court first held that the

defendant's discriminatory hiring and firing constituted tortious acts under the meaning of the

Section 302(a).  It next held that there was personal jurisdiction under both Section 302(a)(2) and

Section 302(a)(3) because the conduct included actions both within and outside the state.

The allegations concerning Schwartz's behavior in New York are far different from those

in *Holland*.  Plaintiff does not allege facts establishing that Schwartz's presence alone, or even

combined with the LinkedIn invitation, amounts to sexual harassment or gender discrimination

or an actionable hostile work environment claim.   A hostile work environment claim under

NYCHRL "need not be 'severe or pervasive'" but it still must "amount to 'unwanted

gender-based conduct.'"  *Erasmus v. Deutsche Bank Ams. Holding Corp.*, 2015 WL 7736554, at

*7 (S.D.N.Y. Nov. 30, 2015); *see also Bank Brussels*, 305 F.3d at 125 (in Section 302(a)(3)

context, "a plaintiff need not actually prove that defendant committed a tort but" is still required

to "state a colorable cause of action").  Schwartz is not alleged to have had any interaction with

Plaintiff at all when he was in New York.  Nor can Plaintiff rely on the LinkedIn invitation as an

out-of-state tort committed in New York because "the residence or domicile of the plaintiff alone

is not sufficient to establish that a defendant's tortious conduct occurred in New York."

*Thackurdeen v. Duke Univ.*, 130 F. Supp. 3d 792, 804 (S.D.N.Y. 2015), *aff'd*, 660 F. App'x 43

(2d Cir. 2016) (defendant's phone call to plaintiffs in New York could not establish there was tortious infliction of emotional distress in New York).

Finally, Plaintiff's claim under N.Y. Labor Law § 194 cannot be the basis for the "tortious act within the state" because Schwartz is not an "employer" as defined by that statute. That statute provides:

> No employee with status within one or more protected class or classes shall be paid a wage at a rate less than the rate at which an employee without status within the same protected class or classes in the same establishment is paid for: (a) equal work on a job the performance of which requires equal skill, effort and responsibility, and which is performed under similar working conditions, or (b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions; except where payment is made pursuant to a differential based on: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a bona fide factor other than status within one or more protected class or classes, such as education, training, or experience.

N.Y. C.P.L.R. § 194(1).

That statute provides a remedy for employees against their employers.  *See* N.Y. Lab. L. § 198; *see also Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 580-81 (2d Cir. 2020).  N.Y. Labor Law § 190 defines "employer" to "includ[e] any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."  N.Y. Lab. L. § 190(3).  Plaintiff has not alleged that Schwartz had the authority, as a manager based in Austin, to "employ[] any individual" at Indeed such that he any actions by him could be said to violate the statute.  Therefore, personal jurisdiction cannot be maintained based on this claim.

### 3.    Section 302(a)(3)

To establish jurisdiction under N.Y. C.P.L.R. § 302(a)(3), Plaintiff must allege that "(1) the defendant committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant

expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159, 162 (2011) (N.Y. C.P.L.R. § 302(a)(3)(ii)); *see also* N.Y. C.P.L.R. § 302(a)(3)(i) (replacing the fourth and fifth elements with "[defendant] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state").

Under Section 302(a)(3), a defendant's "act must have caused injury to a person or property within New York." *Doe v. Del. State Police*, 939 F. Supp. 2d 313, 325-26 (S.D.N.Y. 2013). In determining whether an injury to person or property in New York has been alleged, courts apply a "situs-of-injury test, which asks them to locate the original event which caused the injury." *Bank Brussels*, 171 F.3d at 791. "[T]he situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff." *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990). "In other words, the situs of injury is where the critical events associated with the dispute occurred." *Int'l Telecom, Inc. v. Generadora Electricia del Oriente, S.A.*, 2002 WL 1072230, at *2 (S.D.N.Y. May 28, 2002).

The tortious act of rape in Connecticut and the "first effects" of that rape were felt in Connecticut, not New York. *Bank Brussels*, 171 F.3d at 791. Although Plaintiff "undoubtedly continued to experience pain and suffering from [the rape] upon [her] return to New York, a litigant may not carry an injury home for purposes of section 302(a)(3)." *Thackurdeen*, 130 F. Supp. 3d at 805 (citing cases); *see also Wilson*, 2002 WL 31929120, at *4 (original event was location of sexual assault in Florida). The third element is not met.

Plaintiff's claims relating to discrimination and aiding and abetting discrimination also do not establish personal jurisdiction under Section 302(a)(3) for several reasons, including that Plaintiff has not alleged that any of Schwartz's conduct supporting those claims, other than the rape, constitutes a tortious act or constitutes an "injury to a person . . . in New York" for the reasons discussed under Section 302(a)(2). And with respect to the claims against Schwartz under N.Y. C.P.L.R. § 213-c and the GMVA, ongoing emotional trauma that continued from the rape is not an element of either statute.

Because the Court does not have personal jurisdiction over Schwartz, the claims against him are dismissed.

### CONCLUSION

The Indeed Defendants' motion to compel arbitration is GRANTED. Dkt. No. 29. Schwartz's motion to dismiss for lack of personal jurisdiction is GRANTED. Dkt. No. 47. Schwartz is dismissed from the action as a defendant.

A stay of proceedings is mandatory after "all claims have been referred to arbitration and a stay [has been] requested" by a party. *Katz v. Cellco P'ship*, 794 F. 3d 341, 345 (2d Cir. 2015). In this case, all claims have been ordered to be submitted to arbitration and the Indeed Defendants have requested that the Court enter a stay pending the result of the arbitration. *See* Dkt. Nos. 32, 63. This case is STAYED pending the outcome of the arbitration.

The Clerk of Court is respectfully directed to close Dkt. Nos. 29, 47.


SO ORDERED.

Dated: January 19, 2021
     New York, New York            _____
                                           LEWIS J. LIMAN
                                 United States District Judge